THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Massachusetts Correction Officers
Federated Union, Michael Mosher,
Zac Gustafson, Denina Dunn, and
Angela Pucci,

      Plaintiffs,

v.

Charles D. Baker, in his Official Capacity as
Governor of the Commonwealth of
Massachusetts, and Carol A. Mici, in her
individual capacity as Commissioner of the
Massachusetts Department of Correction,

      Defendants

USDC Case No. _____

**PLAINTIFFS' COMBINED MOTION FOR PRELIMINARY INJUNCTION AND
STATEMENT OF REASONS IN SUPPORT**

## I.    MOTION

Pursuant to Fed. R. Civ. P. 65, the Plaintiffs move the Court for an order preliminarily

enjoining the Defendants from requiring them, and their similarly-situated fellow employees and

union members, to receive the COVID-19 vaccine as a condition of continued employment.  In

support of their motion, the Plaintiffs state that each of the relevant factors support the issuance

of the requested order.

First, the Plaintiffs have a sufficient likelihood of success on one or more of their claims:

1) that the Order violates the Contracts Clause of the United State Constitution, because it

substantially impairs rights contained in the collective bargaining agreement between the

Plaintiff Massachusetts Correction Officer Federated Union ("MCOFU" or "Union") and the

Commonwealth of Massachusetts without any constitutionally significant offsetting public

benefit; 2) the Order interferes with and effectively deprives them of their right to decline

unwanted medical treatment, which is a fundamental right in the constitutionally-relevant sense, and 3) the Order will interfere with, and effectively deprive them of, their right to employment security absent just cause, which, in this context, is a property right secured to them under substantive due process.

Second, the Plaintiffs will suffer irreparable harm if the Order is allowed to take effect. The individual Plaintiffs will be forced to choose which of two constitutionally-protected rights to forfeit:  the right to decline unwanted medical treatment, or the right to continued employment absent just cause to end it.  Laws and orders that interfere with rights emanating from the privacy protections of the Fourteenth Amendment are deemed to cause irreparable harm.  Additionally, the Plaintiff MCOFU will separately sustain irreparable harm, insofar as is members will be deprived of the substantial economic security benefits for which it bargained on their behalf.

Third, the balance of hardships favors the Plaintiffs.  While the individual Plaintiffs will be forced to decide which constitutional right to forfeit, and MCOFU will sustain a constitutionally-significant suspension of the employment security terms of its negotiated CBA, the interests that the Order are intended to serve can still be accommodated through maintaining the same mitigation measures that are in effect today.  They include, but are not limited to, regular testing, continued mask-wearing requirements, prompt quarantining of those DOC employees who have tested positive, as well as ongoing efforts to address the concerns motivating the unvaccinated employees in an effort to effect voluntary compliance.  These available alternatives reveal that any hardships that would come from suspending the order are preventable by other, less constitutionally destructive means.

Finally, the public interest factor either favors the Plaintiffs, or is sufficiently close as to not be dispositive.

## II.     STATEMENT OF REASONS WHY MOTION
## SHOULD BE ALLOWED

### A.     <u>Facts Informing The Motion.</u>

The materials before the Court show the following largely undisputed facts.  The individual Plaintiffs have worked for varying lengths of time for the Massachusetts Department of Correction ("DOC") as Correction Officers, responsible for the care, custody and control of the state's inmate population.  Each have completed their respective probationary periods and thus pursuant to a term of the Massachusetts Civil Service Law, G. L. c. 31, § 41, their employment cannot be terminated unless the DOC has "just cause" to do so, and then only after they have been afforded a mandated pre-termination process, consisting of notice of charges and a fair opportunity to be heard.  Affidavit of Derek O'Connor.

The positions in which Plaintiffs are employed are within statewide Bargaining Unit 4 ("Unit 4"), for which the Plaintiff MCOFU is the duly-designated collective bargaining representative.  Pursuant to G. L. c. 150E, § 6, MCOFU and the Commonwealth have negotiated and entered into a series of collective bargaining agreements (CBAs) which establish the terms and conditions of employment of Unit 4 members.  O'Connor Aff., ¶ 4.

Among the subjects that the parties have contractually regulated is that of employment security.  They have agreed that upon completing a defined probationary period, Unit 4 members cannot be terminated unless the Commonwealth/DOC has just cause to do so.  Like the civil service statute, the "just cause" term of the CBA impliedly requires that before any termination decision is made, the officer will be afforded notice of the charged misconduct and afforded an opportunity to be heard.[1]  In addition, it has long been recognized in labor arbitration that

---

[1]  <u>See, e.g.</u>, <u>Chauffeurs, Teamsters & Helpers Loc. Union No. 878 v. Coca-Cola Bottling Co.</u>, 613 F.2d 716, 719 (8th Cir. 1980)("[A]rbitrators have long been applying notions of "industrial due process" to "just cause" discharge cases.").

> [a] fundamental component of the just-cause standard is that employees must be told what kind of conduct will lead to discipline — especially if the penalty is to be discharge. An employee can hardly be expected to abide by `the rules of the game' if the employer has not communicated those rules, and it is unrealistic to think that, after the fact, an arbitrator will uphold a penalty for conduct that an employee did not know was prohibited.

Koven & Smith, Just Cause: The Seven Tests (1985).  The just cause term of their CBA has been in effect over the course of many contracts.

Another subject that the parties have regulated, at Article 32 of their CBA, is that of "contagious disease."  See Complaint, Exhibit 1, p. 79.  By its terms, it exists to "provide the operational framework and clarity to the department's handling of instances at Institutions and/or facilities where the outbreak of a contagious disease has occurred."  While the parties have agreed to allow the Commonwealth/DOC to require Unit 4 members to be *tested* for infectious disease, there is no term in that article, or anywhere else in the CBA, that affords the Commonwealth/DOC the contract right to require covered Unit 4 employees to *receive any vaccinations* as a condition of maintaining their employment.

In March 2020, the Defendant, Governor Baker declared a state of emergency in response to the global pandemic associated with the spread of the novel coronavirus.  The facts relating to this early stage of the pandemic, as well as and the various executive orders that followed, are set out in Desrosiers v. Baker, 489 Mass. 369 (2020).

As relates to the DOC, the ongoing operation of its prison system was determined to be an essential service, and its correction officer employees were designated "essential workers" and thus continued to report for their work as they did before the pandemic.  See https://www.mass.gov/info-details/covid-19-essential-services#law-enforcement,-public-safety,-first-responders-.

Since the onset of the pandemic, the DOC has taken a variety of "mitigation measures," that is, steps to reduce the introduction, exposure, and transmission of COVID-19 at its facilities. They include regular testing of staff and inmates; mandatory quarantining of all those testing positive; offering vaccines; requiring that staff wear face masks at all times; insuring that social distancing is practiced; and regular deep cleaning of surfaces.  O'Connor Aff., ¶ 9.

The DOC tracks the number of staff who have tested positive for the coronavirus.  As of September 24, 2021 the number of DOC staff with active cases is very low, with all reporting facilities reporting "less than 5," a reporting result that means the number of positives was between one and four.  See https://www.mass.gov/doc/september-24-2021-covid-19-staff-testing-daily-report/download

On August 19, 2021, Governor Baker issued Executive Order 595 ("The Order") which is the subject of this action.  Complaint, Exhibit 2.  By its terms, it requires – as a condition of continued employment – that all employees within the state Executive Department, including the Plaintiffs and all those in positions within Bargaining Unit 4, demonstrate, by October 17, 2021, that they have received the full COVID-19 vaccination.  It affords a limited exemption for those a) unable to receive the vaccination die to medical disability and b) unwilling to receive the vaccine due to sincerely held religious beliefs.

Each of the individually-named Plaintiffs wish to decline the vaccine but retain their DOC employment.  O'Connor Aff., ¶ 7.  Plaintiff Mosher is opposed to receipt of the vaccine in large part because his brother died two weeks after receiving the vaccine; he believes that the vaccine caused or at least substantially contributed to his untimely death.  Plaintiff Gustafson has previously tested positive for the coronavirus and thus believes, based on relevant research, that he now possesses natural immunity as robust as that said to be achieved by the developed COVID-19 vaccines.  Plaintiff Dunn, an African American female, opposes taking the vaccine

because of deep-seated distrust of the pharmaceutical industry.  And Plaintiff Pucci, a female who hopes to have a family in the future, opposes receiving the vaccine out of concerns as to its impact on fertility.  O'Connor Aff., ¶ 7.

      **B.**    **Legal Standards Under Rule 65.**

The Court is authorized to hear the Plaintiff's' request for declaratory and injunctive relief.  See Va. Office for Protection & Advocacy v. Stewart, 563 U.S. 247, 255-56 (2011) (claims for prospective injunctive relief and declaratory judgments to stop an ongoing violation of federal law by a state official may be brought against the state official, sued in her official capacity).

Regarding this motion, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Of the listed factors, it is said that "[t]he first two factors are the most critical.  Both require a showing of more than mere possibility.  Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent an injunction."  Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)(citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)).

"Likelihood of success" is said to be "the most important part of the preliminary injunction assessment."  Jean v. Massachusetts State Police, 492 F.3d 24, 27 (1st Cir. 2007).

As has recently been summarized in a case arising in a similar context,

> [c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. . . .  The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also consider the overall public

interest.  In the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.

Baptiste v. Kennealy, 490 F. Supp. 3d 353, 381 (D. Mass. 2020).

**C.      Plaintiffs Are Likely To Succeed On One Or More Of Their Constitutional Claims.**

**1.      The Contracts Clause Count.**

**a.      Governing Principles.**

MCOFU has a legally-sufficient likelihood of succeeding on its claim that the Order

violates the Contracts Clause of the U.S. Constitution, which, by its plain terms, prohibits a state

from "pass[ing] any . . . Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10, Cl

1.  Applicable "to any kind of contract,"[2] including collective bargaining agreements,[3] "the

Contracts Clause restricts the power of States to disrupt contractual arrangements."  Sveen v.

Melin, 138 S. Ct. 1815, 1821 (2018).

Admittedly, "[n]ot all laws *affecting* pre-existing contracts violate the Clause"; rather,

[t]o determine when such a law crosses the constitutional line, [courts have] long applied a two-step test.  The threshold issue is whether the state law has "operated as a substantial impairment of a contractual relationship." . . .  In answering that question, [courts]  . . . consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. . . .  If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, [courts]  ask[] whether the state law is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose."

Sveen v. Melin, 138 S. Ct. at  1821–22 (emphasis added).[4]

---

[2]  Sveen v. Melin, 138 S. Ct. 1815, 1821(2018).
[3]  See In re Financial Oversight and Management Board for Puerto Rico, 979 F.3d 10 (2020).
[4]  See also Washington Teachers' Union Loc. No. 6, Am. Fed'n of Tchrs., AFL-CIO v. Bd. of Educ. of the D.C., 109 F.3d 774, 778 (D.C. Cir. 1997).  "To determine whether a change in law or regulation violates the Contracts Clause, we ask the three questions set forth in General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992):  Does a contractual relationship exist? Did a

As to substantiality of impairment, the general rules have been summarized this way:

> [S]ubstantial impairment does not require a complete destruction of the contractual relationship. . . .  The issue is whether the impairment disrupts reasonable contractual expectations. . . .  The Supreme Court's decisions under the Contracts Clause show that reliance interests are key to this inquiry.  The analysis must "reflect the high value the Framers placed on the protection of private contracts." . . .  Contracts "enable individuals to order their personal and business affairs," and once arranged, "those rights and obligations are binding under the law, and the parties are entitled to rely on them."

Elliott v. Bd. of Sch. Trustees of Madison Consol. Sch., 876 F.3d 926, 934 (7th Cir. 2017)(and noting at p. 935 that "[a]n impairment is even more substantial when it disrupts expectations "in an area where the element of reliance was vital.").

"Legislation causes a substantial impairment if it alters a 'central undertaking' of the contract that 'substantially induced' a party to enter the bargain. . . .  In other words, an impairment is substantial if it disrupts actual and important reliance interests." Elliott, supra, 876 F.3d at 934 (citing and quoting from City of El Paso v. Simmons, 379 U.S. 497, 514 (1965)).

"If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, . . . such as the remedying of a broad and general social or economic problem."  Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411–12 (1983)(internal citation omitted).

Then, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable

---

change in law or regulation impair that relationship?  If a contract has been impaired, was the impairment substantial?  If these questions lead to the conclusion that a substantial impairment occurred, we then ask whether the change is reasonable and necessary to serve an important public purpose.")(internal quotation and citation omitted.)  See also Baptiste v. Kennealy, 490 F. Supp. 3d 353, 383 (D. Mass. 2020)(reciting the "three components" of the Contracts Clause analysis as derived from Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).

conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption'." Energy Rsrvs. Grp., Inc., 459 U.S. at 412 (internal citation omitted).

**b. The Order Will Substantially Impair MCOFU's Rights Under The CBA.**

The Order substantially impairs MCOFU's contractual relationship with the Commonwealth, because by requiring that the DOC summarily terminate the employment of those who decline to be vaccinated, it re-writes and upends the parties' bargain relating to the crucial, contractually-regulated topic of employment security, traditionally seen as one of *basic purposes* of a labor agreement. It has been observed that "[j]ob security is an inherent element of the labor contract, a part of its very being. If wages is the heart of the labor agreement, job security may be considered its soul." Warehousemen & Mail Ord. Emp., Loc. No. 743, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. N. L. R. B., 302 F.2d 865, 872 (D.C. Cir. 1962). See also Dickeson v. DAW Forest Products Co., 827 F.2d 627, 631 (9th Cir.1987)(*Employer (sic) security goes to the very essence of a collective bargaining agreement*.")(emphasis added); Smith v. Kerrville Bus Co., Inc., 709 F.2d 914, 919 (5th Cir.1983) ("To hold as a matter of law that management could, at its sole discretion, terminate an employee without cause would in effect allow it the unqualified power to avoid contractually mandated rights and benefits.").[5]

The primary, but not exclusive, means by which the CBA between the Commonwealth and MCOFU safeguards this vital employee interest in job security is via the Commonwealth's

---

[5] Those historical considerations may properly be considered by the Court in making its "substantiality" determination. See, e.g., Borman, LLC, supra, 777 F.3d at 827 (explaining that "the Supreme Court consistently discusses extrinsic evidence when ascertaining substantiality. See, e.g., Energy Reserves, 459 U.S. at 413–16, (considering the history of federal and state energy regulation); Allied Structural Steel, 438 U.S. at 246–47, (reviewing the economics of pension plans); U.S. Trust, 431 U.S. at 18–19, (examining the "chronology" of events surrounding a bond issue); Simmons, 379 U.S. at 510–14, (recounting the history and purpose of a Texas land-purchase program).

promise that employees may only be terminated for "just cause." Elliott, supra, 876 F.3d at 934-5 (statute that adjusted contract-sourced job security rights caused an "impairment" in the sense relevant to the Contracts Clause, and explaining that "teachers rely on a stable job-security scheme to plan their personal and professional lives, their investments of time and money, and their retirements.").

The Order significantly undermines that crucial "just cause" component of the parties' bargain by unilaterally *adding* "refusal to take the vaccine" as *per se* grounds for termination, a condition of employment that had never before existed. Within this CBA, the parties have listed only a single employee behavior that qualifies for unchallengeable discharge – they have agreed in the "just cause" term of the CBA that disciplinary action taken as a result of an employee engaging in a strike, work stoppage, slowdown, or withholding of services is unchallengeable. By adding "refusal to get vaccinated" as automatic grounds for discharge, the Order re-writes the discipline term of the CBA, and in so going *greatly diminishes* the scope of the bargained-for just-cause protection. See Elliott, supra, 876 F.3d at 934 (citing United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 19 n.17 (1977) for the proposition that a "law adjusting the 'express terms of an agreement' is more likely to be an unconstitutional impairment.").

The reasoning of the Seventh Circuit in the Elliott case is instructive. There the state passed a statute that cut back on rights of tenured teachers in regard to layoffs. Applying the Contracts Clause analysis to that law change, the court concluded that the statute

> substantially disrupted tenured teachers' expectations about job security. It is not fair to change the rules so substantially when it is too late for the affected parties to change course. Tenured teachers cannot have do-overs in their careers, either to earn more money to make up for the lost job security or to find better job security in another school district or in another field entirely.

Elliott, 876 F.3d at 936. The Court thus concluded that the statute "substantially impaired [the plaintiff's] tenure contract rights by disrupting his reasonable contractual expectations." Id.

The Order at issue here also effectively negates MCOFU's ability to enforce those employee rights through the final and binding arbitration process also established within that article.  It is as if "vaccine declining" had been added to the section of the contract that renders unchallengeable those discharges that are imposed for strike activity.  See, e.g., Massachusetts Cmty. Coll. Council v. Com., 420 Mass. 126, 131 (1995)(state statute that established mandatory furlough program "substantially impaired the Commonwealth's obligation to pay compensation to the various affected employees covered by the collective bargaining agreements.").

Implementing the Order would interfere with MCOFU's reasonable expectations concerning important rights and duties set out in the CBA, including the parties' arrangement of their respective rights and duties in regard to respect to employee discipline.  Certainly MCOFU could reasonably expect that during the life of that contract, the Commonwealth would not, by legislation or executive order, substantively rearrange rights that had been contractually set in the CBA.  See, e.g., Massachusetts Community College Council v. Com., 420 Mass. 126 (1995).

"There is a second requirement for the impairment to be substantial:  the parties must not have anticipated the change in law."  Elliott, supra, 876 F.3d at 935.  "If the parties anticipated a change in the law, then their bargain would reflect the risk of a future impairment. . . .  If the new law was foreseeable, then reliance on the impaired terms may have been unreasonable so that a disruption to the relationship would not be deemed substantial."  That requirement is met here.

In entering into this CBA, MCOFU could never have anticipated that the Massachusetts Governor would, by executive order, require the Commonwealth, as an employer, to add "receiving a vaccine" as a new condition of continued employment for employees in positions within bargaining unit 4.  There was no then-existing statutory or regulatory scheme that even suggested that vaccine mandates could be added mid-term so as to literally require the discharge of incumbent unit 4 employees.  Nothing in the extant CBA provided such notice either.  No risk

11

of a future impairment of this kind or magnitude could be fairly attributed to MCOFU at the time of contracting.

**c.      The Order Is Not Drawn In An Appropriate
And Reasonable Way To Advance A Significant
And Legitimate Public Purpose.**

It appears that the broad purposes identified in the Order have already been deemed significant and legitimate.  "Stemming the spread of COVID–19 is unquestionably a compelling interest . . . ."  Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67, 208 L. Ed. 2d 206 (2020).  But the Contracts Clause analysis looks to *the means* used to serve legitimate interests, not their existence *vel non*, and the relevant rule is "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1, 31, (1977).

The facts as to the state of the virus today reveal that there *are* evident, and *more moderate*, courses of action that Massachusetts could take to address the concerns identified in the Order.  Governmental and private employers – including the Massachusetts judicial branch[6] – have adopted a wide variety of tools and strategies to combat COVID-19, including encouraging voluntary, uncoerced vaccination (here, among both DOC staff and inmates), setting and enforcing at-work mask mandates, setting and enforcing meaningful social distancing rules, providing for regular testing, either pooled or individual, to detect new cases,[7] and the prompt quarantining and isolation of new cases and the tracing of known recent contacts of those who have tested positive.  The fact that this long after the introduction of voluntary vaccines, so many governmental employers have eschewed vaccine mandates in favor of these other courses of action, reveals there *are* moderate alternatives to the Order's vaccine mandate.

---

[6]  See Complaint, ¶ 44 and Exhibits 5 and 6.
[7]  See https://www.mass.gov/doc/september-24-2021-covid-19-staff-testing-daily-report/download

In sum, MCOFU has a reasonable likelihood of prevailing on its claim that the Order unconstitutionally impairs rights and expectations contained in its CBA with the Commonwealth.

2.  **The Substantive Due Process Counts.**

a.  **Governing Principles.**

The substantive component of due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). "T]he touchstone of due process is protection of the individual against arbitrary action of government. Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

"While due process protection in the substantive sense limits what the government may do in both its legislative. . . and its executive capacities . . . criteria *to identify what is fatally arbitrary* differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." Id.  (emphasis added). The two tests are as follows:

> In executive act cases, the issue of fatal arbitrariness should be addressed as a "threshold question," asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." . . .
>
> If the claimed violation is by legislative enactment (either facially or as applied), analysis proceeds by a different two-step process that does not involve any threshold "conscious-shocking" inquiry. The first step in this process is to determine whether the claimed violation involves one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and traditions," . . . The next step depends for its nature upon the result of the first. *If the asserted interest has been determined to be "fundamental," it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation. . . . If the interest is determined not to be "fundamental," it is entitled only to the protection of rational-basis judicial review. . . .*

Hawkins v. Freeman, 195 F.3d 732, 738–39 (4th Cir.1999) (en banc) (footnote omitted).

As to the executive/legislative distinction, one court has summarized the rules this way:

> Executive acts typically arise from the ministerial or administrative
> activities of the executive branch and characteristically apply to a limited
> number of people, often to only one. . . .  This includes employment
> terminations or individual acts of zoning enforcement. . . .  Legislative
> acts, on the other hand, generally apply to a larger segment of—if not all
> of—society. . . . [L]aws and broad-ranging executive regulations are the
> most common examples. . . . A legislative act also involves policy-making
> rather than mere administrative application of existing policies.

Kentner v. City of Sanibel, 750 F.3d 1274, 1280 (11th Cir. 2014).  See also Lewis v. Brown, 409

F.3d 1271, 1273 (11th Cir. 2005)("[E]xecutive acts typically arise from the ministerial or

administrative activities of members of the executive branch.  The most common examples are

employment terminations.").  An "executive action" in the substantive due process analysis

context is typically a "specific act of a governmental officer."  Cty. of Sacramento v. Lewis, 523

U.S. 833, 846.

The Order at issue here is the product of legislative, not executive action, notwithstanding

that it was issued by the Governor of Massachusetts, an official of the Massachusetts executive

branch.  See Lewis v. Brown, 409 F.3d 1271, 1273 (11th Cir. 2005)("[S]ome government

officials  . . . act in both a legislative and executive capacity" and thus the task in that instance is

to "sort[] out which hat they were wearing when they made a decision.").  The Order has the

central characteristics of a legislative act:  it applies to a large group of people – approximately

42,000 – and plainly reflects a substantive policy decision that is characteristic of legislative

action.  See Abdi v. Wray, 942 F.3d 1019 at 1027–28 (order issued by executive agency "is akin

to . . . legislative action because, as with an act of a lawmaking body, the federal government

here is attempting, through policy, to achieve a stated government purpose . . ..").

Application of the Gluckberg test shows that the Plaintiffs have a likelihood of success on

the merits of their substantive due process claim.  First, the Order impacts a recognized

*fundamenta*l right[8] – the right to decline unwanted medical treatment.  See Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990) (finding that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); Cook v. Gates, 528 F.3d 42, 49 (1st Cir. 2008)("In Glucksberg, the Supreme Court catalogued the following "liberty interests" as "specially protected" by the due process clause:  the right to marry; to have children; to direct the education of one's children; to enjoy marital privacy; to use contraception; to maintain bodily integrity; to choose to have an abortion; and *to refuse unwanted medical treatment*.")(emphasis added); Coons v. Lew, 762 F.3d 891, 899 (9th Cir. 2014), as amended (Sept. 2, 2014) ("The Supreme Court has recognized fundamental rights to determine one's own medical treatment, Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L.Ed.2d 224 (1990), and to refuse unwanted medical treatment, Washington v. Glucksberg, 521 U.S. 702, 724, 117 S. Ct. 2258, 138 L.Ed.2d 772 (1997) . . ..").

Next, the Order will directly and substantially interfere with that fundamental right.  See Lyng v. Castillo, 477 U.S. 635, 638 (1986); Zablocki v. Redhail, 434 U.S. 374, 387 & n.12 (1978).  While admittedly no one is forcibly placing a needle directly into the arms of the plaintiffs or their co-workers, their exercise of their right to decline the vaccine will cost them their employment security, a property right that, in these factual circumstances, is also entitled to substantive due process protection, and thus the Order mandates a choice that the Plaintiffs cannot constitutionally be made to make.

Finally, the Defendants are unlikely to meet their burden of showing that the Order is narrowly tailored to achieve a compelling government purpose.  See Zablocki v. Redhail, 434

---

[8]  Fundamental rights are those that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty."  Glucksberg, 521 U.S. at 720–21.

U.S. 374, 388 (1978)("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.").  The existence of reasonable and numerous alternatives to accomplishing the listed goals, which have been embraced by other public employers, including the Massachusetts judiciary, shows that the "strict scrutiny" test cannot be satisfied in these circumstances.

While the Defendants will assert that the constitutionality of the Order should not be determined by the strict scrutiny test, but rather under the deferential standard employed in Jacobson v. Massachusetts, 197 U.S. 11 (1905),[9] it is open to question whether the Supreme Court will sanction such low-level scrutiny in the context of COVID-19 vaccine mandates challenged as infringing on fundamental rights, including the now-recognized-as-fundamental right to decline unwanted medical treatment.[10]  As recently observed,[11] "Jacobson was written before the modern tiers of constitutional scrutiny, so a legitimate question is the extent to which Jacobson applies with full force today.  This is a topic of some debate."  See also Calvary Chapel Dayton Valley v. Sisolak, —— U.S. ——, 140 S. Ct. 2603, 207 L.Ed.2d 1129 (slip op. at 5) (July

---

[9] Jacobson stands for the proposition that "it is within the police power of the state to provide for compulsory vaccination," Zucht v. King, 260 U.S. 174, 176 (1922).  Under Jacobson, a vaccine order will pass constitutional muster unless a) it lacks a real or substantial relation to public health and safety, b) is beyond all question a plain palpable invasion of rights secured by fundamental law, and c) is so arbitrary and oppressive as to warrant judicial interference."  As has recently been observed, Jacobson is "essentially . . . rational basis review."  Roman Catholic Diocese of Brooklyn v. Cuomo, U.S., 141 S. Ct 63, 70 (2020)(Gorsuch, J., concurring).
[10] See Big Tyme Invs., L.L.C. v. Edwards, No. 20-30526, 2021 WL 118628 (5th Cir. Jan. 13, 2021)(Willett, concurring)("Jacobson was decided 116 years ago.  And I do not believe it supplies the standard by which courts in 2021 must assess emergency public health measures.  Jacobson predates modern constitutional analysis, particularly the judge-invented tiers of scrutiny that distinguish between strongly and weakly protected rights (and between protected and unprotected classes).  This elaborate three-tiered regime of judicial interest-balancing, a twentieth-century innovation rather than something enshrined in the Constitution, pervades contemporary constitutional decisionmaking.").
[11] Klaassen v. Trustees of Indiana Univ., No. 1:21-CV-238 DRL, 2021 WL 3073926, at *20 (N.D. Ind. July 18, 2021).

24, 2020) (Alito, J, dissenting) ("[I]t is a mistake to take language in <u>Jacobson</u> as the last word on what the Constitution allows public officials to do during the COVID–19 pandemic. ");
<u>Bayley's Campground Inc. v. Mills</u>, 463 F. Supp. 3d 22, 31–32 (D. Me. 2020) (finding the <u>Jacobson</u> standard did not apply to a contemporary right-to-travel claim).

The Plaintiffs are also likely to succeed on their claim that the Order impermissibly interferes with *another* right secured to them under the substantive due process clause of the Fourteenth Amendment -- that is, the right, grounded in state law, not have their employment security infringed on by arbitrary and capricious governmental action.  <u>See</u> <u>Newman v. Com. of Mass.</u>, 884 F.2d 19, 25 (1st Cir. 1989)(stating the rule that "authorities who make an arbitrary and capricious decision significantly affecting a tenured teacher's employment status are liable for a substantive due process violation."); <u>Thompson v. Bass</u>, 616 F.2d 1259, 1267 (5th Cir.1980) (finding that public employee who had a property interest in continued  employment could establish a denial of substantive due process if termination was the result of arbitrary or capricious action); <u>Wagner v. Gibson</u>, WDQ–12–3581, 2013 WL 4775380, at *6 (D.Md. Sept. 4, 2013) (county employee who could only be terminated for just cause had a protected property interest in continued employment, in context of a substantive due process claim).

The state laws that give rise to the Plaintiffs' protected property interest are G. L. c. 150E, §6, which permitted MCOFU and the Commonwealth to contractually agree to the employment security terms we have discussed above, and G. L. c. 31, § 41, which invested the Plaintiffs with the right to continue their employment unless the DOC had "just cause" to end it.
<u>Harhay v. Town of Ellington Bd. of Educ.</u>, 323 F.3d 206, 212 (2d Cir. 2003) ("A public employee has a [protected] property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge.").

For many of the same reasons that informed the Contracts Clause analysis above, it would, in these circumstances, constitute arbitrary and capricious and irrational action to require that the plaintiffs *elect* whether to forfeit their fundamental privacy-based right to decline unwanted medical treatment in order to salvage their constitutionally-protected property interest in continued employment.

     **D.**       **Irreparable Harm Is Threatened.**

"To be entitled to injunctive relief, the movant must demonstrate the inadequacy of legal remedies." All. of Auto. Manufacturers v. Gwadosky, 304 F. Supp. 2d 104, 117 (D. Me. 2004). Within this circuit, in cases involving allegations of governmental infringements on constitutionally-protected rights, harm has been considered "irreparable" in the relevant sense in "cases involving alleged infringements of . . . privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." Pub. Serv. Co. of New Hampshire v. Town of W. Newbury, 835 F.2d 380, 382 (1st Cir. 1987). See also Airbnb, Inc. v. City of Bos., 386 F. Supp. 3d 113, 125 (D. Mass. 2019) (A "threatened, continuous violation of a constitutional right constitutes irreparable harm for purposes of a preliminary injunction motion.").

A right rooted in the constitution's privacy protection "must be carefully guarded for *once an infringement has occurred it cannot be undone by monetary relief*." Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981)(emphasis added). See also SisterSong Women of Color Reprod. Just. Collective v. Kemp, 410 F. Supp. 3d 1327, 1347 (N.D. Ga. 2019)(irreparable harm prong satisfied where state law "violates the constitutional right to privacy, which, in turn, inflicts per se irreparable harm on Plaintiffs"); Planned Parenthood, Se., Inc. v. Bentley, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) ("[C]ourts presume that violations to the fundamental right to privacy are irreparable."); Lewis v. Delaware

State Coll., 455 F. Supp. 239, 251 (D. Del. 1978)([T]he plaintiff's strong showing of probable success on the merits of her claims that she has been deprived of her constitutional rights of privacy, substantive due process and equal protection is sufficient to establish the likelihood of irreparable harm.").

Recently, in Klaassen v. Trustees of Indiana Univ., 2021 WL 3073926, at *41 (N.D. Ind. July 18, 2021)[12], a district court concluded that a COVID-19 vaccine mandate as applied to university students, challenged as an infringement of their liberty interests under the Fourteenth Amendment's substantive due process clause, presented a case of irreparable harm, although they failed to show a sufficient likelihood of success on the merits of their particular claims.

Here, the Plaintiffs have made the case that the Order infringes on their right to decline unwanted medical treatment.  Since that right is considered to emanate from the right to privacy, which in turn is sourced within the substantive due process clause of the Fourteenth Amendment, the irreparable harm prong of the test is satisfied here.

The Plaintiff MCOFU has also met the irreparable harm test with respect to its Contracts Clause claim, that is, that the Order will significantly interfere, in a constitutionally-impermissible way, with rights secured to it and its members under the CBA.  While Plaintiffs have found no case on point within this circuit, it has been held elsewhere that an alleged deprivation of "rights violated under the Contracts Clause . . . raises a presumption of irreparable harm."  Connecticut State Police Union v. Rovella, 494 F. Supp. 3d 210, 220 (D. Conn. 2020). See also Anderson Fed'n of Tchrs. v. Rokita, 2021 WL 2685791, at *14 (S.D. Ind. June 30, 2021) (irreparable harm standard deemed met where plaintiffs "show[ed] a likelihood of success on the merits of their Contracts Clause and First Amendment free speech claims.").

---

[12]  Aff'd, Klaassen v. Trustees of Indiana University, 7 F.4th 592 (7th Cir. 2021).

**E.       The Public Interest Weighs In Favor Of Injunctive Relief.**

An injunction does "not disserve the public interest [if] it will prevent constitutional deprivations." Jackson Women's Health Org. v. Currier [Jackson I], 760 F.3d 448, 458 n.9 (5th Cir. 2014).  Where the undisputed public interest in reducing the spread of the coronavirus and reducing the number of severe illnesses from COVID-19 can be achieved, as has been the case to date, by means that do not lead to constitutional deprivation, such as those instituted by the Massachusetts judicial branch, it cannot be said that maintaining the status quo pending the assessment of Plaintiffs' claims on their merits will harm those interests.

## III.     CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request that this Court, after hearing, preliminarily enjoin the Defendants from imposing the vaccine mandate set out in the Order, until a determination can be made on the merits of the claims advanced herein.

Respectfully submitted,

On behalf of the Plaintiffs, Massachusetts Correction Officers Federated Union, Michael Mosher, Zac Gustafson, Denina Dunn, and Angela Pucci,

By its attorneys:

/s/ James F. Lamond
Alan J. McDonald
James F. Lamond
Dennis M. Coyne
McDonald Lamond Canzoneri
352 Turnpike Road, Suite 210
Southborough, MA 01772-1756
(508) 485-6600
amcdonald@masslaborlawyers.com
jlamond@masslaborlawyers.com
dcoyne@masslaborlawyers.com

Date:  September 29, 2021

## <u>CERTIFICATE OF SERVICE</u>

  I, James F. Lamond, hereby certify that I have this day, via email, served the foregoing document upon Earl Wilson, Esq., Massachusetts Dept. of Correction, Director of Employee Relations, earl.wilson@state.ma.us (for Carol Mici), and Jennifer Greaney, Esq., Assistant Attorney General, Government Bureau, Massachusetts Office of the Attorney General, jennifer.greaney@mass.gov, as well as the general mailbox of the Massachusetts Office of the Attorney General's Government Bureau, AGOPolicyGovernment@state.ma.us.


Dated:  September 29, 2021       */s/ James F. Lamond*     
                   James F. Lamond