# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Massachusetts Correction Officers Federated Union, Michael Mosher, Zac Gustafson, Denina Dunn, and Angela Pucci,<br><br>*Plaintiffs,*<br><br>v.<br><br>Charles D. Baker, in his Official Capacity as Governor of the Commonwealth of Massachusetts, and Carol A. Mici, in her Official Capacity as the Commissioner of the Massachusetts Department of Correction,<br><br>*Defendants.* | Case No. 21-cv-11599-TSH |

**MEMORANDUM OF AMICI CURIAE
DR. YONATAN GRAD, DR. MONIK JIMÉNEZ, DR. AMIR M. MOHAREB, AND
PRISONERS' LEGAL SERVICES**

The *amici*, who are three public health experts and an organization that represents incarcerated individuals, submit this memorandum to address two important issues in this case: the balance of the harms and the public interest. The plaintiffs, who are the Massachusetts Correction Officers Federated Union and four of its members, seek a preliminary injunction that would halt Governor Baker's vaccine requirement for Executive Department employees in the Department of Correction. To rule on that request, this Court will have to consider not only the plaintiffs' likelihood of success on the merits, but the balance of harms and the public interest. *Cf. Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

Yet the plaintiffs ignore the harm that their requested injunction would cause incarcerated people, and "frame the public interest too narrowly, by focusing on its members to the exclusion of

1

everyone else." *State Police Association of Massachusetts v. Commonwealth*, 2184-cv-02117, Order Denying Mtn. for Prelim. Injunc., Slip Op. 8 (Mass. Sup. Ct., Sept. 23, 2021) (hereinafter, *SPAM*). Indeed, the sole paragraph in their papers dedicated to the balancing of equities and the public interest does not even mention incarcerated people, and it omits any discussion of the medical and scientific consensus regarding COVID-19 transmission and prevention. *See* Dkt. No. 2, p. 20.

Properly considered, these vital considerations weigh heavily against granting the preliminary injunction. Congregate facilities like prison are particularly high-risk environments for COVID-19. *See Commonwealth v. Nash*, 486 Mass. 394, 406 (2020). And although mitigation efforts such as masking and testing are important—because they can *mitigate* the spread of COVID-19 after it enters a facility—they are not as effective as *preventing* COVID-19's introduction in the first place by vaccinating the staff who commute, daily, between the outside community and the prison. *Cf. Plata v. Newsom*, 4:01-cv-01351, Notice of Filing Report of J. Clark Kelso, Receiver, Dkt. 3638, p.5 (N.D. Cal., Aug. 4, 2021) (hereinafter, Receiver's Report) (Receiver overseeing the California prison medical care system concluding, "mandatory COVID-19 vaccination for institutional staff is necessary to provide adequate health protection for incarcerated persons."). In fact, in ordering implementation of the California Receiver's recommendation, a federal court has held that failing to require COVID-19 vaccination for all prison staff constitutes deliberate indifference to a substantial risk of serious harm that violates the Eighth Amendment rights of incarcerated people. *Plata v. Newsom*, -- F. Supp.3d --, No. 01-cv-01351, 2021 WL 4448953, *11 (N.D. Cal., Sept. 27, 2021).

*Amici* have a unique perspective on these two crucial elements of the preliminary injunction test. They submit this short memorandum to assist this Court's analysis of the pending motion.

**INTERESTS OF THE AMICI**

Dr. Yonatan Grad is the Melvin J. and Geraldine L. Glimcher Associate Professor in the Department of Immunology and Infectious Diseases at the Harvard T.H. Chan School of Public Health, and associate physician in the Division of Infectious Diseases at Brigham and Women's Hospital (BWH) and Harvard Medical School. He is the author of more than 100 peer-reviewed articles in epidemiology, infectious diseases, and other areas, including 13 peer-reviewed papers, 4 submitted manuscripts available as pre-prints and several op-eds covering the COVID-19 pandemic. Recently, he was the co-author of *Model-informed COVID-19 Vaccine Prioritization Strategies by Age and Serostatus*, published in Science, which described approaches to optimizing vaccine distribution to minimize the number of cases and deaths from COVID-19. Dr. Grad has submitted sworn testimony regarding COVID-19 in Massachusetts carceral facilities, and he was recently recognized as an expert qualified by his knowledge, skill, experience, training and education to offer opinion testimony regarding COVID-19 infection, transmission, and vaccination; methods to measure COVID-19 prevalence; and methods to prevent COVID-19. *See Committee for Public Counsel Services v. Barnstable County Sheriff's Office*, No. SJ-2020-0757, Special Master Findings of Fact, Dkt. No. 73, ¶ 371 (May 10, 2021) (hereinafter Barnstable Special Master Findings of Fact).

Dr. Monik C. Jiménez is an Assistant Professor of Epidemiology at the Harvard T.H. Chan School of Public Health, an associate epidemiologist at Brigham and Women's Hospital (BWH), and an Assistant Professor of Medicine at Harvard Medical School. She is the author of more than 40 peer-reviewed articles on the impact of COVID-19 on incarcerated populations, racial/ethnic and sex inequities cardiovascular disease, epidemiology, oral epidemiology, stroke, and oral health. Most recently, she was the senior author on the paper *Epidemiology of COVID-19 Among Incarcerated Individuals and Staff in Massachusetts Jails and Prisons*, published in JAMA Network Open, which assessed the COVID-19 burden in Massachusetts prisons and jails. She has submitted sworn

testimony regarding COVID-19 in Massachusetts carceral facilities, and she was recently recognized as an expert qualified by her knowledge, skill, experience, training, and education to offer opinion testimony regarding COVID-19 infection, transmission, and vaccination; methods to measure COVID-19 prevalence; and methods to prevent COVID-19 transmission. *See* Barnstable Special Master Findings of Fact, ¶ 373.

Dr. Amir Mohareb is a board certified Infectious Diseases physician in Massachusetts General Hospital and an Instructor in Harvard Medical School. He is the author of more than 30 peer-reviewed articles on topics primarily related to epidemiology and infectious diseases, including COVID-19. Dr. Mohareb has extensive expertise with COVID-19 specifically, including direct clinical care for patients and infection control practices to prevent the spread of the disease. Dr. Mohareb has conducted research on important questions related to COVID-19, including optimal testing strategies in Massachusetts, isolation strategies for people experiencing homelessness in Boston, isolation strategies in South Africa, and COVID-19 mitigation strategies in colleges and universities. He has published and presented research on COVID-19 in the Massachusetts prison system, most recently as the senior author of a manuscript entitled, *Association Between Prison Crowding and COVID-19 Incidence Rates in Massachusetts Prisons, April 2020-January 2021*, published in JAMA Internal Medicine. Dr. Mohareb has also monitored the Department of Correction policies related to COVID-19 since the onset of the pandemic in his role as an expert retained by a class of prisoners in the custody of the Department of Correction.

Prisoners' Legal Services (PLS), formerly known as Massachusetts Correctional Legal Services, was established in 1972 to protect and promote the civil and constitutional rights of Massachusetts prisoners. PLS provides legal assistance through litigation, informal advocacy, and advice to prisoners on a wide variety of issues, including medical care, conditions of confinement, guard brutality, solitary confinement, access to rehabilitation programs, and parole. PLS currently

4

serves as counsel to a certified class of all prisoners confined at Department of Correction facilities asserting that Commissioner Mici and other executive branch officials have violated the constitutional rights of prisoners by inadequately responding to the COVID-19 pandemic. *Foster, et al., v. Mici, et al.,* No. 20-00855-D (Mass. Sup. Ct., filed Apr. 17, 2020).

## ARGUMENT

### I.     COVID-19 poses a particularly high risk in congregate settings like prisons.

The plaintiffs repeatedly suggest that the Massachusetts Judiciary's safety protocols, which do not require vaccination of all staff, would work equally well in the Department of Correction. *See* Dkt. No. 1, ¶ 44; Dkt. No. 2, p. 20. This suggestion that the threat of COVID-19 in prisons is no different from other settings cannot withstand the scientific consensus regarding "the unique, potentially deadly consequences that COVID-19 presents for individuals in our prisons and jails." *Nash*, 486 Mass. at 406. As the CDC explains, "incarcerated and detained people spend almost all of their time within congregate environments where groups of people share the same space, which increases the chance for COVID-19 to spread once introduced."[1]

People who live and work in prisons are especially susceptible to the primary ways in which COVID-19 spreads. *See, e.g.,* Receiver's Report, at 10-16.  First, the virus spreads through inhalation of respiratory droplets expelled when an infected person exhales, talks, coughs or sneezes.[2] Because this form of transmission is most likely to occur when someone is physically close to an infectious person, generally within about six feet, people who live and work prisons are more likely to contract

---

[1] *See* Center for Disease Control and Prevention, *FAQs for Correctional and Detention Facilities: How to Prepare your Facility for the Possible Spread of COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Oct. 13, 2021) (hereinafter, *CDC FAQs*).
[2] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Oct. 13, 2021) (hereinafter, *CDC COVID Spread)*.

5

the virus.[3] Second, COVID-19 can spread through airborne transmission, where droplets containing the virus can remain suspended for hours.[4] Such transmission is more likely to occur in enclosed spaces with poor ventilation like prisons.[5]

Consequently, prison populations have higher rates of infection and mortality than other populations. Through June 2021, at least 398,627 incarcerated people had contracted COVID-19 nationwide, and at least 2,715 had died from the virus.[6] As a recent CDC Morbidity and Mortality Weekly Report concluded, "[i]ncarcerated populations have experienced disproportionately high rates of COVID-19 related illness and death compared with the general U.S. population, due in part to congregate living environments that can facilitate rapid transmission of SARS-CoV-2, the virus that causes COVID-19, and the high prevalence of underlying medical conditions associated with severe COVID-19."[7]

---

[3] *See CDC FAQs, People in Prison or Jail*; *see also* Abigail I. Leibowitz, Mark J. Siedner, Alexander C. Tsai, Amir M. Mohareb, *Association Between Prison Crowding and COVID-19 Incidence Rates in Massachusetts Prisons, April 2020-January 2021* JAMA Internal Medicine (Aug. 9, 2021), E4 (finding that in Massachusetts state prisons, "for every 10% increase in prison population (as a percentage of design capacity) there was a 14% increased risk of COVID-19" and "compared with weeks when prisons maintained an incarcerated population below 70% of design capacity, prisons operating between 70% and 100% and prisons operating at more than 100% of their design capacity had approximately 3 and 5 fold higher incidence rates of COVID-19, respectively.").
[4] Dyani Lewis, *Mounting Evidence Suggests Coronavirus Is Airborne — But Health Advice Has Not Caught Up, Nature* (July 8, 2020), https://www.nature.com/articles/d41586-020-02058-1.
[5] *See* Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019- ncov/more/scientific-brief-sars-cov-2.html (last visited Oct. 13, 2021).
[6] The Marshall Project, *A State-by-State Look at Coronavirus in Prisons*, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last checked Oct. 13, 2021) (collecting COVID-19 prison data March 2020-June 2021). These numbers are widely believed to be underestimates due to variations in screening and testing policies.
[7] Liesl Hagan, David W. McCormick, Christine Lee, et al, *Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021*, Centers for Disease Control and Prevention, 70 MMWR Morb Mortal Wkly Rep 1349 (2021) (hereinafter *CDC Texas MMWR*).

The introduction of COVID-19 into prisons also has significant collateral consequences that endanger the health and well-being of prisoners. Specifically, the more the virus spreads within a facility, the more likely it is that incarcerated people will experience periods of extreme lockdown and isolation. As the Massachusetts Supreme Judicial Court emphasized, pandemic-related measures "such as cancelling activities and visitation, may be deleterious to the mental health of inmates, while "[p]andemic lockdown conditions effectively can lengthen sentences by limiting the opportunities by which inmates ordinarily would be able to earn good-conduct sentence deductions." *Foster v. Comm'r of Correction*, 484 Mass. 698, 709 (2020).

## II.     In prisons, mitigation is no substitute for vaccination.

The plaintiffs suggest that the Department of Correction's current mitigation measures "have not proven to be unsuccessful" and that "robust enforcement of mask mandates and physical distancing rules, regular testing and symptom monitoring with prompt isolation and quarantine requirements for those who test positive, and regular and effective surface cleaning" "would serve equally well" as the vaccine requirement for staff members. Dkt. No. 1, ¶¶ 44-45. While plaintiffs provide no evidence to support these claims, there is plenty of evidence to refute them.[8]

To begin, mitigation alone has not prevented people in Massachusetts prisons from contracting and dying of COVID-19. Over the course of the pandemic, at least 21 people

---

[8] Plaintiffs do not offer any evidence on how mitigation measures like masking, social distancing and testing are implemented in DOC facilities. Dkt. No. 2-1, ¶ 9. For example, the frequency of testing, the speed of returning test results, and the commitment to monitor the populations for symptoms to enable timely testing of symptomatic individuals, are critical components of a testing regime, yet the plaintiffs do not provide any of these details. The little information that is publicly available regarding staff COVID-19 testing suggests that they do not even conduct weekly testing. *See CPCS v. Chief Justice of the Trial Court*, SJC-12926, Special Master's Weekly Report, Dkt. No. 175, (Sept. 15, 2021) (hereinafter Special Master's Report). The Department of Correction ended its weekly reporting of staff testing to the Special Master on June 16, 2021, but in the six weeks between May 5, 2021 and June 16, 2021, they reported just 280, 501, 220, 488, 330 and 179 tests each week, respectively, across all 16 of their facilities. *See* Special Master's Report at 101. Publicly available information similarly suggests that the Department of Correction does not even conduct weekly

incarcerated in the Department of Correction have died of COVID-19 and at least 2,615 people incarcerated in the Department of Correction have contracted the virus.[9] At least 954 correctional officers and staff have also contracted the virus.[10]

What is more, there have always been, and continue to be, limits to the protections provided by non-vaccination measures. Even under the strictest enforcement regimes, masks must still be removed to eat and sleep. And even under a weekly testing regime of all staff—which does not appear to occur at the Department of Correction, *see* Special Master's Report at 101—the virus can spread between tests. As the California Receiver explains:

> In sum, prison systems, even those that take important mitigation measures such as masking and social distancing, are not designed and operated to prevent the transmission of a highly contagious virus and cannot be redesigned to do so effectively in the near term. The conditions of confinement and the manner in which prisons are operated deprive incarcerated people of the same opportunities to protect themselves through social distancing and limiting contact that are available to the public at large. Limiting the introduction of COVID-19 into the prisons is critical to protecting the health of incarcerated people.

Receiver's Report at 16.

Vaccination is a necessary tool to achieve this goal. The plaintiffs argue that the vaccine "has proved not to fully prevent the spread of the virus." Dkt. No. 1, ¶ 42. Of course, as the CDC notes, "no vaccine[] is 100% effective."[11] But the evidence demonstrates that COVID-19 vaccines reduce the likelihood of infection and "provide considerable protection against severe disease and death."[12]

---

testing of all incarcerated people. Specifically, the most recently available information provided to the Department of Public Health between October 1, 2021 and October 7, 2021 indicated that the Department received just 978 test results of incarcerated people over those seven days, representing approximately 16% of their total incarcerated population. *See* DOC COVID-19 Inmate Dashboard, https://www.mass.gov/info-details/doc-covid-19-inmate-dashboard (last visited Oct. 13, 2021).
[9] *See* Special Master's Report at 102.
[10] *Id.*
[11] Centers for Disease Control and Prevention, *COVID-19 Vaccines and Vaccination*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html, (last visited Oct. 13, 2021).
[12] *Id.*

Critically, the vaccines also limit the transmission of the virus, both because people who have been vaccinated are less likely to become infected in the first place, and because "evidence suggests fully vaccinated people who become infected are infectious for shorter period of time than unvaccinated people."[13] As a result, the CDC emphasizes that vaccination remains "a critical prevention measure to help end the COVID-19 pandemic."[14]

For these reasons, recent CDC Morbidity and Mortality Weekly Reports emphasized, "[i]n settings where physical distancing is challenging, including correctional and detention facilities" *both* "multicomponent prevention strategies (e.g., testing, medical isolation, quarantine, and masking)" *and* "vaccination" "are critical to limiting SARS-CoV-2 transmission."[15] Of the two, however, "vaccination is the most important strategy to prevent severe illness and death."[16] And "staff vaccination coverage is particularly important given their frequent contact with the outside community, which creates opportunity for potential introduction of SARS-CoV-2 to the facility."[17]

Recent outbreaks in other prisons demonstrate the vital importance of staff-vaccination. In a federal facility in Texas this summer, despite a vaccination rate of nearly 80% among incarcerated people, 74% of incarcerated people housed in two units contracted COVID-19, where BOP records indicated that nearly two-thirds of staff members in the prison were unvaccinated.[18] Notably, "the identification of a single viral lineage among all sequenced specimens in this outbreak suggests a

---

[13] *Id.*
[14] *Id.*
[15] *CDC Texas MMWR.*
[16] Catherine M. Brown, Johanna Vostok, Hillary Johnson et al, *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings – Barnstable County, Massachusetts, July 2021*, Centers for Disease Control and Prevention, 70 MMWR Morb Mortal Wkly Rep 31, 1059 (2021).
[17] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Oct. 13, 2021)
[18] *CDC Texas MMWR.*

single introduction of the virus into the prison."[19] And in California state facilities, "[b]etween July 31 and September 10, 2021, a staggering 48 outbreaks 'have been traced back to institutional staff.'" *Plata*, 2021 Wl 4448953, at *8; *see also id.* (noting "half of the 14 outbreaks between May and July 2021 have been traced to staff and that number could still grow because analysis of the remaining outbreaks is ongoing").

It is therefore no surprise that the California Receiver determined that "[v]accination of staff is *the best way* to achieve the greatest health benefits for incarcerated persons. There is no other equally effective method." Receiver's Report at 10 (emphasis in original). Other prisons have reached the same conclusion. The Federal Bureau of Prisons emphasizes the priority of vaccinating staff because "staff—who come and go between the facility and the community—present a higher potential vector for COVID-19 transmission" and therefore "[v]accinating staff protects fellow staff, inmates at the facility, and the community." [20] Oregon, Washington, Colorado and Illinois have similarly adopted mandatory vaccination requirements applicable to correctional staff. *Plata*, 2021 WL 4448953, at 11 n.9. Here in Massachusetts, other congregate-living facilities—including nursing homes[21] and more than 50 colleges and universities[22]—have instituted a staff vaccine requirement. The vaccination of staff has become all the more important with the explosion of the Delta variant,

---

[19] *Id.*

[20] Federal Bureau of Prisons: COVID-19 Coronavirus *BOP's COVID-19 Response*, https://www.bop.gov/coronavirus/ (last visited October 13, 2021).

[21] Mass. Exec. Order No. 629 (Aug. 4, 2021).

[22] Andy Thomason and Brian O'Leary, *Here's a List of Colleges That Require Students or Employees to Be Vaccinated Against COVID-19*, THE CHRONICLE OF HIGHER EDUCATION, (last updated: Oct. 6, 2021), https://www.chronicle.com/blogs/live-coronavirus-updates/heres-a-list-of-colleges-that-will-require-students-to-be-vaccinated-against-covid-19 (last visited Oct. 13, 2021).

which is more contagious than previous variants of the virus, and with the prospect of further mutations of the virus as the pandemic continues.[23]

## CONCLUSION

A trial court in Massachusetts has already denied one motion to enjoin the Governor's vaccination requirement for Executive Department employees based in large part on the Commonwealth's significant interest in protecting its workforce and those who involuntarily come in contact with that workforce. *See SPAM*, Slip Op. 7-8. Those same considerations apply with even more force here given the increased risk of COVID-19 in prisons.

Respectfully submitted,

DR. YONATAN GRAD, DR. MONIK JIMÉNEZ, DR. AMIR M. MOHAREB, AND PRISONERS' LEGAL SERVICES

By their attorneys,

| | |
|---|---|
| */s/ James R. Pingeon* | */s/ Matthew R. Segal* |
| James R. Pingeon, BBO #541852 | Matthew R. Segal, BBO #654489 |
| David Milton, BBO #668908 | Jessie J. Rossman, BBO #670685 |
| Michael J. Horrell, BBO #690685 | AMERICAN CIVIL LIBERTIES UNION |
| PRISONERS' LEGAL SERVICES |   FOUNDATION OF MASSACHUSETTS, INC. |
| 50 Federal Street, 4th Floor | 211 Congress Street |
| Boston, MA 02110 | Boston, MA 02110 |
| (617) 482-2773 | (617) 482-3170 |
| jpingeon@plsma.org | msegal@aclum.org |

October 13, 2021

---

[23] Centers Disease Control and Prevention, *Cases & Data*, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html, (last visited Oct. 13, 2021).

11

**CERTIFICATE OF SERVICE**

  I hereby certify that on October 13, 2013, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record. In addition, a copy was sent via electronic mail to all counsel of record.

October 13, 2021                   */s/ Matthew R. Segal*
                             Matthew R. Segal