UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS CORRECTION OFFICERS
FEDERATED UNION, MICHAEL MOSHER,
ZAC GUSTAFSON, DENINA DUNN, &
ANGELA PUCCI,

                    Plaintiff,

        v.

CHARLES D. BAKER, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF
MASSACHUSETTS, & CAROL A. MICI, IN HER
OFFICIAL CAPACITY AS COMMISSIONER OF
THE MASSACHUSETTS DEPARTMENT OF
CORRECTION,

                    Defendants.

CIVIL ACTION
NO. 4:21-cv-11599-TSH

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MAURA HEALEY
ATTORNEY GENERAL

Jennifer E. Greaney (BBO No. 643337)
*Assistant Attorney General*
Christine Fimognari (BBO No. 703410)
*Special Assistant Attorney General*
Grace Gohlke (BBO No. 704218)
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2981/2206/2527
Jennifer.Greaney@mass.gov
Christine.Fimognari@mass.gov
Grace.Gohlke@mass.gov

Dated: October 13, 2021

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

FACTS ......................................................................................................................2

ARGUMENT ..............................................................................................................9

    I.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims. ................... 9

        A.      Plaintiffs Cannot Succeed on Their Contracts Clause Claim. ................. 10

            1.      MCOFU Asserts No Cognizable Contracts Clause Claim Because Its Contract Remedy Remains Intact ............................. 10

            2.      Even if the Court Were to Apply Contracts Clause Analysis to Count I, Plaintiffs' Claim Would Be Unlikely to Succeed. ...................................................................................... 12

                  a.      EO 595 Does Not "Substantially Impair" the CBA.......... 12

                        i.      EO 595 Does not "Undermine" the Plaintiffs' Bargain. ................................................. 13

                        ii.      EO 595 Is Consistent With "Reasonable Expectations." .................................................. 14

                        iii.      EO 595 Does Not Affect Plaintiffs' Ability to Safeguard or Reinstate Rights............................ 14

                  b.      Even if EO 595 "Substantially Impairs" the CBA, It Is Nonetheless "Reasonable" and "Appropriate." ............ 15

        B.      Plaintiffs Have No Likelihood of Success on Their Substantive Due Process Claims (Counts II and III)................................................... 17

            1.      Plaintiffs' Due Process Claims Trigger Only Rational-Basis Review. ..................................................................................... 17

                    a.      Where the State Acts as Employer, No More Than a Rational Nexus Between the Job and the Deprivation of Rights is Required Under the Substantive Due Process Clause. ..................................... 17

                    b.      Plaintiffs Have Identified No "Fundamental Right.".......... 20

                          i.      The Executive Order Does Not Implicate Any Fundamental Liberty Interest............................. 20

                          ii.      Plaintiffs Have No "Fundamental Right" in Continued Employment by the State. ............... 22

2.     EO 595 Easily Survives Rational Basis Review............................ 23

C.     Count IV Fails Because It Is Barred By the Eleventh Amendment.......... 24

II.     The Plaintiffs Have Not Shown Irreparable Harm. ................................................ 24

III.    There is No "Fit" Between an Injunction and the Public Interest Here................. 25

CONCLUSION..........................................................................................................................26

# INTRODUCTION

The American death toll from COVID-19 now exceeds that of the 1918 influenza pandemic, making COVID-19 the deadliest outbreak of an infectious disease in the United States in more than a century.[1]  Nearly 44 million Americans have been infected with COVID-19, and more than 700,000 have died from the virus.[2]  Those numbers continue to rise – not only across the country, but across the Commonwealth.  On Tuesday, October 12, 2021, the Department of Public Health ("DPH") reported (based on new data from the long weekend) a total of 4,466 new confirmed cases of COVID-19 and 36 new confirmed deaths caused by COVID-19.[3]  Against this backdrop, four individual Massachusetts correction officers and the labor union that represents them challenge Governor Charles D. Baker's Executive Order 595 ("EO 595" or the "Executive Order"), which requires all State executive department employees to demonstrate that they are vaccinated against COVID-19 by October 17, 2021, unless they qualify for a medical or religious exemption under the order.  The question Plaintiffs put to the Court is narrow:  They ask whether their continued employment can be conditioned on their obtaining COVID-19 vaccinations.  The answer to that question is an unequivocal "yes," since it has been well established for more than a century that a state *can* mandate vaccination in response to a deadly pandemic such as COVID-19.  *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *see also Klaassen v. Trustees of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) ("Given *Jacobson* . . .  "there

---

[1]      *See* Cecilia Smith-Schoenwalder, *U.S. Coronavirus Death Toll Surpasses 1918 Flu Pandemic*, U.S. News & World Report, September 20, 2021, https://www.usnews.com/news/national-news/articles/2021-09-20/us-coronavirus-death-toll-surpasses-1918-flu-pandemic ("roughly 1 in 500 Americans have died from the coronavirus").

[2]      *See Coronavirus in the U.S.: Latest Map and Case Count*, New York Times (updated daily), https://www.nytimes.com/interactive/2021/us/covid-cases.html.

[3]      *See* Dep. of Public Health's COVID-19 Interactive Data Dashboard as released on October 12, 2021, https://www.mass.gov/info-details/covid-19-response-reporting; copy attached hereto as Exhibit A.

can't be a constitutional problem with vaccination against SARS-CoV-2").[4]  Because the

Plaintiffs have no likelihood of success on the merits of their claims, will suffer no "irreparable

harm" from EO 595, and show no interest that could possibly outweigh the strong public interest

in a vaccination mandate covering tens of thousands of Massachusetts workers,[5]  Plaintiffs'

motion for a preliminary injunction must be denied.

## FACTS

**The Virus and the Vaccines**

COVID-19 is the disease caused by the SARS-Co-V-2 virus.  *See* Declaration of

Lawrence Madoff at ¶ 8.  It "is infectious, contagious, and can cause serious disease,

hospitalization, and death."  *Id.*  "The long-term negative consequences of COVID-19 infection,

even for those who were vaccinated before infection or have only mild symptoms, are not yet

fully understood."  *Id.* at ¶¶ 8.  Moreover, COVID-19 has been deemed a disease dangerous to

public health pursuant to Massachusetts statute, Mass. G.L. c. 111, § 6.  *Id.*  As of October 4,

2021, DPH had reported 772,932 confirmed cases of COVID-19 and 18,394 confirmed deaths

due to COVID-19 in the Commonwealth.  *Id.* at ¶ 9.

Currently, however, COVID-19 is a "vaccine preventable disease."  Madoff Dec. at ¶10.

As is commonly known, the U.S. Food and Drug Administration ("FDA") has approved three

COVID-19 vaccines for use.  *Id.* at ¶ 11.  They are known as:  Pfizer BioNTech ("Pfizer"),

Moderna, and Johnson & Johnson's Janssen ("J&J").  *Id.*  "The FDA reviewed extensive safety

---

[4]      On August 12, 2021, the Supreme Court (Barrett, J.) denied the *Klaassen* plaintiffs' request for injunctive relief.  *See Docket Sheet in Klaasen, et al. v. Trustees of Indiana Univ.*, Case No. 21A15, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21a15.html.

[5]      Katie Lannan, *Baker Orders Vaccine Mandate for 42,000 State Employees*, WBUR News, August 19, 2021, https://www.wbur.org/news/2021/08/19/baker-vaccine-mandate-state-employees ("In addition to . . . 42,000 employees, the policy will also apply to another roughly 2,000 contracted workers employed by executive departments . . . .").

data on each of the vaccines prior to authorizing its use and deemed them safe." *Id.* Additionally, all three vaccines have also been found to be safe by the World Health Organization and numerous other national and regional public health agencies. *Id.* Doses of these vaccines have been administered to *billions* of people globally and "extensive systems are in place to monitor their safety on an ongoing basis." *Id.* All three vaccines are widely available in the Commonwealth. *Id.* at ¶ 14. There is no indication of any shortage of any of the three – including Pfizer – within the State. *Id.* And in Massachusetts alone, the total number of people who had received either one dose of the J&J or two doses of either Pfizer or Moderna as of October 5, 2021, was in excess of *4.6 million*. *Id.* at ¶ 15[6]

Notwithstanding the ample availability of three safe and effective vaccines, *see* Madoff Dec. at ¶¶ 11-12, 14, 16, COVID-19 continues to spread. Each day, the DPH reports new COVID-19 infections and deaths across the Commonwealth. *See* n.3, *supra*. This continued spread is "primarily in unvaccinated populations." Madoff Dec. at ¶ 17. While no vaccine is 100% effective, "[u]nvaccinated individuals are at much higher risk of infection, and therefore at much higher risk of transmitting COVID-19 to their contacts both in their homes and communities and in the occupational setting." *Id.* at ¶¶ 18. So-called "breakthrough" infections of COVID-19 generally result in less severe disease and less risk of hospitalization or death than infections in unvaccinated people. *Id.* at ¶ 19. Vaccination benefits not only the person receiving the vaccine, but also others in that person's community, because a high population-level vaccination rate reduces the likelihood of community spread of the virus, including

---

[6]     By September 28, 2021, a total of 78 percent of the Massachusetts Department of Correction's ("DOC's") inmate population of 6,118 had completed a COVID-19 vaccination regimen, meaning that they had received the single dose J&J vaccine or both doses of the Moderna or Pfizer vaccine by that date. *See* Declaration of Jason Dobson at ¶ 4. Additionally, 82 percent of DOC inmates had received at least one dose of a COVID-19 vaccine. *Id.* at ¶ 3.

"breakthrough" infections.  *Id.* at ¶ 20.  Additionally, an increased vaccination rate in the overall population reduces the opportunity for new variants of SARS CoV-2 to emerge.  *Id.* at ¶ 21.  The importance of limiting opportunities for new variants to develop and thrive is illustrated by the Delta variant, which is far more infectious than the original strain of SARS-CoV-2 and has now become the dominant strain of the virus in Massachusetts and nationally.  *Id.*

Although people who have been infected with SARS Co-V-2 may have some protective immunity to reinfection, the level of that protection is highly variable from person-to-person, while "the level of immunity derived from vaccination against COVID-19 is reliably high and well validated in numerous studies."  Madoff Dec. at ¶ 22.  Vaccinated people are less likely to be reinfected with the virus.  *Id.* at ¶23.  According to recent scholarship, "among previously SARS-CoV-2-infected individuals, being unvaccinated was associated with 2.34 times the odds of reinfection compared with being fully vaccinated."  *Id.*

**The Collective Bargaining Agreement**

The Massachusetts Correction Officers Federated Union ("MCOFU") is a party to a collective bargaining agreement (the "CBA") with the Commonwealth.  *See* Complaint (Dckt. 1) at ¶ 9 & Att. 2; Combined Motion for Preliminary Injunction and Statement of Reasons (Dckt. 2) ("Pl. Brief") at p. 3.  The individually named Plaintiffs – Michael Mosher, Zac Gustafson, Denina Dunn, and Angela Pucci – are all members of the bargaining unit covered by the CBA. *See* Complaint at ¶¶ 3-7.  The CBA expired by its own terms on June 30, 2021.  *See* Complaint at ¶ 9 & Att. 1, p. 81, Art. 34.  Pursuant to an "evergreen" clause, however, the CBA's terms have remained in effect since that date.  *See id.*, p. 81, Art. 34.

The CBA (*see* Complaint at Att. 1) contains numerous provisions regarding MCOFU members' health and fitness to serve as Correction Officers ("COs"), including multiple references to the possibility of infectious diseases entering DOC facilities, and various terms that

4

may impact privacy concerns of COs.  For example, the CBA requires MCOFU members "to be subject to an immediate drug test if probable cause of drug use exists as determined by his/her Superintendent or management designee."  *See* Complaint at Att. 1, p. 76, Art. 29.  The CBA provides for "Physical Fitness Standards" for COs to be developed by the Human Resources Division ("HRD") of the Commonwealth's Executive Office of Administration & Finance, including standards of fitness for initial hiring as a CO.  *Id.*, pp. 76-78, Art. 30, & Memorandum of Understanding ("MOU"), pp. 89-90.  Additionally, an MOU attached to the CBA includes detailed requirements for COs' personal appearance and grooming.  *Id.*, p. 101

Article 32 of the CBA, entitled "Contagious Disease," requires testing for contagious diseases under specified circumstances, including testing for tuberculosis.[7]  *See* Complaint, Att. 1, p. 79.  If there is an outbreak of a contagious disease and a MCOFU member found to have tested positive for the contagion and needing medication "shall have such medication provided by the Department [of Correction]."  *Id.*, p. 80, ¶ 6.  Any employee who tests positive for tuberculosis must have a follow-up chest X-Ray.  *Id.* at ¶ 7.  Additionally, "[a]ny employee who tests positive for any communicable disease is expected to and must follow all recommended health procedures, i.e., the taking of medication, proper testing, etc., which are provided by the [DOC] and DPH."[8]  *Id.* at ¶ 9.  Finally, the CBA states:  "Where credible evidence exists (as determined by the appropriate state Agency or Department) of a communicable disease (e.g., Tuberculos[i]s, Hepatitis B, etc.), the Employer shall forthwith make every reasonable effort to

---

[7]     According to the Centers for Disease Control ("CDC"), a tuberculosis skin test is performed by "injecting a small amount of fluid (called tuberculin) into the skin on the lower part of the arm," followed within 48-72 hours by having a trained healthcare worker look for a reaction on the arm and analyze the size of any raised, hard area or swelling that appears."  *See* https://www.cdc.gov/tb/topic/testing/tbtesttypes.htm.  Alternatively, a different type of tuberculosis test can be performed by drawing blood with a needle.  *Id.*

[8]     The Plaintiffs state that COVID-19 vaccines are "medication and/or medical treatment."  Complaint at ¶¶ 23, 40.

provide all employees coming into contact with the afflicted person(s) and/or environment, with appropriate training and advice." *Id.*, p. 61, Art. 20, §1.C.

## Extra-Contractual Regulation of Correction Officers

In addition to the terms of the CBA described above – existing long before EO 595 issued on August 19, 2021 – a variety of additional job-related limitations on personal choices apply to COs employed by the DOC. To start with, a statutory requirement prohibits COs from smoking tobacco products *at all* – not even on their own time, on or off of DOC premises. *See* Mass. G.L. c. 27, §2; *see also*, Personnel Administration Rules promulgated by HRD, at Part 23, https://www.mass.gov/doc/personnel-administration-rules/download; DOC Policy, 103 DOC § 203.03 (internet cite *infra*). [9]  Additionally, DOC's policies, published at https://www.mass.gov/lists/department-of-correction-public-policies#public-policies-, include the following requirements:

- DOC employees may be required to undergo a medical examination by a physician of their choice to determine fitness to return to work following sick leave in excess of five days, with the possibility of a second examination by a physician representing DOC in the event of a dispute about the employee's fitness to return to work.[10]  *See* 103 DOC 209.07.

- If a CO is required to take a drug test, there are extensive requirements related to when and how an on-site urine sample is collected for this purpose. *See* 103 DOC 240.04. For example, the "collection official" must be positioned in such a manner that they can "verify that the specimen passes directly from the employee's body into the specimen bottle." 103 DOC 240.04(2)(b).

---

[9]     The smoking prohibition is related to enhanced employment benefits received by COs and other public employees in certain specified jobs, such as police and firefighters. *See* G.L. c. 32, § 94.

[10]     The DOC's policies include a section on the Hepatitis B vaccine, its benefits, and its availability at no cost for COs who wish to take it for their own protection. *See* 103 DOC 631.08. COs may decline the Hepatitis B vaccine under the policy. *See* 103 DOC 631.08. Hepatitis B is, of course, very different from SARS Co-V-2. According to the CDC, Hepatitis B is a "vaccine-preventable liver infection" that is not spread by ways other than inhalation. https://www.cdc.gov/hepatitis/hbv/index.htm . COVID-19 is, in contrast, a highly contagious respiratory disease spread through inhalation of particles. *See* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (CDC Summary of Updates to Scientific Brief, May 7, 2021, stating modes of transmission include "inhalation of virus").

- DOC policy permits "unclothed search of a staff member" based on "reasonable suspicion" that the employee is "engaging, or attempting to engage in, prohibited activities." 103 DOC 506.04(2)-(3).  If the staff member refuses, they may be subject to "immediate disciplinary action."  103 DOC 506.04(3)(G).  Where there is "evidence of an imminent threat of serious personal injury" or a situation that "imminently jeopardizes the safety, security, or orderly operation of the facility, or threatened public safety," the unclothed search team may use force to require staff members to submit to searches.  *See* 103 DOC 506.04(4).

**The Executive Order**

The Executive Order requires HRD to issue a written policy by October 18, 2021, "for all executive department employees to require proof of COVID-19 vaccination."  *See* Complaint at Att. 2, § 2.  HRD's policy "shall" contain the following:  (1) a requirement that all covered employees demonstrate no later than October 17, 2021 "that they have received COVID-19 vaccination and, going forward, that they demonstrate that they are maintaining full COVID-19 vaccination;" (2) a procedure to allow "limited exemptions" from the vaccination mandate "where a reasonable accommodation can be reached for any employee who is unable to receive COVID-19 vaccination due to medical disability or who is unwilling to receive COVID-19 vaccination due to a sincerely held religious belief;" (3) a method for documenting employees' vaccination status and confidentially storing that information separate from the employees' personnel files; (4) a provision for appropriate use of Commonwealth-provided sick leave or other time off for employees to get vaccinated; and (5) appropriate enforcement measures, including "include progressive discipline up to and including termination for non-compliance . . . ."  *See id.* at § 2, ¶ 1-5.

**MCOFU's Prohibited Practices Charge**

On August 23, 2021, the Director of HRD's Office of Employee Relations, John Langan, sent an e-mail attaching a draft Vaccine Verification Policy to MCOFU's counsel with a request that MCOFU's representatives "[p]lease let [him] know a good time for us to meet."  Langan

Dec. at ¶ 5 & Exhibit A.  On August 24, 2021, MCOFU's attorneys demanded that the Commonwealth "bargain in good faith . . . over the decision to require vaccinations. . . ." Complaint at ¶ 25; Att. 3 (e-mail stating, "we believe the decision to mandate vaccinations is a mandatory subject for bargaining"); Langan Dec. at ¶ 6.  In addition to demanding bargaining over the decision to implement a vaccination mandate, MCOFU demanded bargaining over its impacts.  Complaint at ¶ 25; *see also* Langan Dec. at Ex. E.  On August 25, 2021, Langan requested a meeting "as soon as possible."  Langan Dec. at ¶ 7 & Ex. B.  Although he noted that the Commonwealth denies any obligation to negotiate over the decision to implement a vaccination mandate, Langan offered to "immediately begin good faith negotiations over [its] impact."[11]  Complaint at Att. 3; Langan Dec. at Ex. B.  On September 8, 2021, Langan again asked for a meeting with MCOFU's representatives.  *See* Langan Dec. at ¶ 8, Ex. C.  On September 11, 2021, MCOFU's lawyer wrote to Langan that MCOFU was willing to meet for negotiations "over the decision to impose the vaccination mandate and its impacts on the bargaining unit[,]" but "we do not believe that good faith bargaining can occur until, if and when, the Governor rescinds his order."  *Id.* at ¶ 9, Exhibit D.  Langan responded on September 13, 2021, with a proposal for a meeting on September 15, 2021.  *Id.* at ¶ 10 & Ex D.  On September 14, 2021, MCOFU filed a prohibited practices charge with the Commonwealth's Department of Labor Relations ("DLR"), claiming that the Commonwealth is obligated to bargain over both the decision to implement a vaccination mandate and the mandate's impacts on MCOFU's members.  *Id.* at ¶ 12, Exhibit E.  Prior to filing the charge, MCOFU's lawyer had informed Langan by telephone call that "a meeting would not be helpful."  *Id.* at ¶ 11.

---

[11]     The Commonwealth has not waived its right to contest that impact bargaining is required, and it reserves all rights in that regard here.

## ARGUMENT

A preliminary injunction is "a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), that is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Likelihood of success on the merits is the "main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (likelihood of success is the *sine qua non* of a preliminary injunction). Because Plaintiffs' motion fails at every step of the preliminary injunction analysis, it must be denied.

## I.       Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

Plaintiffs' Complaint asserts four causes of action. Count I alleges violation of the Contracts Clause.[12] Counts II and III allege deprivations of substantive due process. Finally, Count IV invokes substantive due process, but is actually a claim that EO 595 is an *ultra vires* act not authorized by the Massachusetts Declaration of Rights. Plaintiffs cannot succeed on any of these four theories for the reasons set forth below.

---

[12]     Defendants assume *arguendo* at this preliminary stage that EO 595 is "legislative" for Contracts Clause purposes, and do so without waiver of their right to revisit the issue. *See, e.g., Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 61 (2d Cir. 2020).

A.      **Plaintiffs Cannot Succeed on Their Contracts Clause Claim.**

1.      **MCOFU Asserts No Cognizable Contracts Clause Claim Because Its Contract Remedy Remains Intact**

Plaintiffs' Contracts Clause claim is fatally flawed for the simple reason that the Contracts Clause "does not bar a state from merely breaching a contract, which is the prerogative of any private party, subject to liability for the breach." *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011). Instead, to establish a Contracts Clause claim, a plaintiff "must show more than a breach . . . it must show that the defendants have somehow impaired its ability to obtain a remedy for a demonstrated breach." *Id.*; *see also TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 349 (2d Cir. 2000). Here, MCOFU is actively pursuing at the DLR its claim that the Commonwealth has an obligation to bargain with it over the decision to implement a vaccine mandate, and that its failure to do so amounts to an unlawful addition of a condition of employment in the form of a basis for discipline or termination. *See* Langan Dec. *Id.* at ¶ 12, Ex. E; ¶ 14 (parties attended mandatory pre-investigation mediation session on October 6, 2021; investigative conference is scheduled for October 21, 2021. That MCOFU is now litigating these claims in the appropriate forum[13] proves that it cannot proceed under the Contracts Clause because its remedy under the CBA and state law, *i.e.*, its ability to litigate whether decisional bargaining was required before EO 595 could be implemented, remains wholly intact. As explained by the Fourth Circuit, "recourse to . . . the Contracts Clause is limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts as to whether a constitutional impairment of a contract has occurred, or has foreclosed the imposition of an adequate remedy for an established impairment." *Crosby v. City of Gastonia*,

---

[13]      Any state law claims MCOFU is pursuing at the DLR (whether arising from the CBA or by statute) are barred in this forum by the Eleventh Amendment. *Virginia Office for Prot. & Adv. v. Stewart*, 563 U.S. 247, 253–54 (2011); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).

635 F.3d 634, 644 (4th Cir. 2011); *see also Carter v. Greenhow*, 114 U.S. 317, 322 (1885);

*Kaminski v. Coulter*, 865 F.3d 339, 346 (6th Cir. 2017) (Contracts Clause "does not protect an

individual constitutional right enforceable under [42 U.S.C.] § 1983, but is rather a structural

limitation placed upon the power of the States");[14] *TM Park*, 214 F.3d at 349 ("it is necessary to

distinguish between legislative action that merely breaches the contract and legislative action that

impairs it, for only the latter is cognizable under the United States Constitution").  In other

words, viable Contracts Clause claims are limited to extraordinarily rare instances where the

state has stripped away a mechanism for vindicating existing contract rights, such as by literally

closing courthouse doors.[15]  Those narrow conditions are not present here.  Because Count I does

not allege any impairment to any of its contract remedies – *which remedies it is actively pursuing*

*at the DLR* – it describes no cause of action on which Plaintiffs can possibly succeed.

---

[14]     Notably, Plaintiffs appear to be proceeding in this Court pursuant to 42 U.S.C. § 1983.  *See*
Complaint at ¶ 2.  Although the Eleventh Amendment does not bar claims against state officials for
injunctive relief based on constitutional claims, *see Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 43 (1st
Cir. 2006), a litigant bringing such a claim "does not have a direct cause of action under the United States
Constitution but must utilize 42 U.S.C. § 1983."  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d
912, 925 (9th Cir. 2001); *see also Wilson v. Moreau*, 440 F. Supp. 2d 81, 92 (D.R.I. 2006).  Both *Crosby*
and *Kaminski* hold, however, that no claim is available under § 1983 in the circumstances presented here.
*See Crosby*, 635 F.3d at 640-41; *Kaminski*, 865 F.3d at 346-47.  For this reason alone, Plaintiffs'
Contracts Clause claim cannot succeed.

[15]     The Plaintiffs will likely cite *Baptiste v. Kennealy*, 490 F. Supp.3d 353 (D. Mass. 2020), as an
example of a Contracts Clause claim recently litigated in this jurisdiction.  But *Baptiste* was about a
temporary legislative moratorium on residential eviction actions.  That case involved precisely the rare
species of claim described by *Carter* and *Crosby* as being available under the Contracts Clause because
the Commonwealth's courts were literally unavailable (temporarily) for vindication of a particular type of
contract remedy (*i.e.*, an eviction action).  *See Baptiste*, 490 F. Supp.3d at 383 (moratorium temporarily
"deprive[d] the landlords of a remedy" for a violation of certain of their leasehold rights).

### 2. Even if the Court Were to Apply Contracts Clause Analysis to Count I, Plaintiffs' Claim Would Be Unlikely to Succeed.

Even if the Court finds Plaintiffs' Count I is not subject to outright dismissal, the claim nonetheless is not "strongly likely" to succeed.[16]  "[N]ot all laws affecting pre-existing contracts violate the [Contracts] Clause."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  Even where substantive contract rights are entirely "wiped out" by a statute, the Contracts Clause is not necessarily offended.  *Id.* at 1825-26.  "Although the language of the Contract[s] Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983), quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934).  To succeed on Count I, Plaintiffs would have to prove that EO 595:  (1) "operate[s] as a substantial impairment of a contractual relationship," *Sveen*, 138 S.Ct. at 1821-22, quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) and (2) is not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,' " *id.* at 1822, quoting *Energy Res. Grp.*, 459 U.S. at 411-12.  Plaintiffs' claim meets neither criterion.

### a. EO 595 Does Not "Substantially Impair" the CBA.

The question whether a state law "substantially impairs" a contract is answered by reference to three factors: (1) whether the regulation "undermines the contractual bargain," (2) whether it "interferes with a party's reasonable expectations," and (3) whether it "prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1822.  MCOFU's allegations do not satisfy any of the three prongs of this test.

---

[16]     To obtain a preliminary injunction, "plaintiffs must show 'more than mere possibility' of success – rather, they must establish a 'strong likelihood' that they will ultimately prevail."  *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012), quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010).

### i.     EO 595 Does not "Undermine" the Plaintiffs' Bargain.

In the "grand scheme" of what the CBA offers MCOFU's members, the impact of a COVID-19 vaccination mandate is minimal and cannot be said to undermine the contractual bargain of the CBA.  The Executive Order does not affect COs' compensation, general working conditions, hours, or leave time.  It does not convert "for cause" employees with significant protection against arbitrary discharges to "at-will" employees who can be discharged for any reason or none at all.[17]  It does not disrupt grievance and arbitration rights.  And, it has not deprived MCOFU of the right to an administrative hearing at the DLR to argue the Commonwealth repudiated the CBA or its statutory obligations to bargain – as demonstrated by the prohibited practices charge that MCOFU is actively litigating.

The Executive Order imposes a new but reasonable requirement on MCOFU's members (and all other executive department employees) in order to address an emergency – *i.e.*, the COVID-19 pandemic that has killed more than 700,000 Americans and more than 18,000 Massachusetts residents.  This requirement can be viewed as a *benefit* – not a detriment for members of MCOFU – because a high rate of inoculation against COVID-19 within a workplace benefits <u>all</u> of the employees who work there.  *See* Madoff Dec. at ¶ 20.  This is why some unions *support* COVID-19 vaccine mandates.[18]  That some MCOFU members might prefer an option to "opt out" of taking the vaccine does not mean EO 595 "undermines" their contract.

---

[17]     *See Beaupre v. Seacoast Sales, Inc.*, 507 F.Supp.3d 353, 361 (D. Mass. 2020) (under Massachusetts law, discharged at-will employees generally cannot succeed on a breach of contract claim because "they may be terminated for any reason at any time"); *Rodio v. R.J. Reynolds Tobacco Co.*, 416 F.Supp.2d 224, 232 (D. Mass. 2006) (at-will employee can be fired for any reason or no reason).

[18]     *See* Nik DeCosta-Klipa, *Massachusetts's Largest Teachers Union Calls for COVID-19 Vaccine Mandate for Students and Staff*, Boston.com, August 17, 2021, https://www.boston.com/news/coronavirus/2021/08/17/massachusetts-teachers-association-covid-vaccine-mandate/; Michael Bonner, *SEIU Local 509 Calls for COVID Vaccine Mandate for All of Its Nearly 20,000 Members in Massachusetts*, MassLive, August 11, 2021,

(footnote continued)

ii.     **EO 595 Is Consistent With "Reasonable Expectations."**

The second prong of the "substantial impairment" analysis concerns contract partners'

"reasonable expectations."  "In this inquiry, it is especially important whether the parties

operated in a regulated industry," *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 190

(1st Cir. 1999), which informs whether the impairment was "foreseeable."  *Sullivan*, 959 F.3d at

64.  The corrections industry is heavily regulated.  MCOFU's members are governed by

numerous regulations *and* CBA provisions that directly impact their personal choices.

MCOFU's members cannot smoke *at all*, must submit to drug testing and searches in specified

circumstances, must accept physical fitness requirements, and must even submit to detailed

grooming requirements.  *See* Facts, pp. 4-7, *supra*.  The CBA directly contemplates the

likelihood that outbreaks of contagious disease could occur within correction facilities and that

COs may have obligations to submit to certain medical recommendations in order to do their

jobs during such an event.  *See, e.g.*, Complaint at Att. 1, p. 80, ¶ 9.  Notably, the CBA also

requires tuberculosis testing, *see id.*, p. 79, which involves either an injection of a small amount

of liquid into the skin to produce a wheal that can later be examined, or a blood draw.  *See* n.7,

*supra*.  In short, EO 595 is consistent with MCOFU members' "reasonable expectations."

iii.    **EO 595 Does Not Affect Plaintiffs' Ability to Safeguard
        or Reinstate Rights.**

Finally, the third question asked by the "substantial impairment" analysis, whether the

regulation "prevents the [contracting] party from safeguarding or reinstating his rights," *Sveen*,

138 S. Ct. at 1822, has already been answered in Part I.A.1 above.  The vaccination mandate

does not prevent MCOFU from safeguarding or reinstating its members' rights, as evidenced by

_____

https://www.masslive.com/coronavirus/2021/08/seiu-local-509-calls-for-covid-vaccine-mandate-for-all-of-its-nearly-20000-members-in-massachusetts.html.

the fact that MCOFU's prohibited practices charge is now proceeding before the DLR.[19]

MCOFU's allegations satisfy none of the three prongs of the "substantial impairment" test.

> ### b.      Even if EO 595 "Substantially Impairs" the CBA, It Is Nonetheless "Reasonable" and "Appropriate."

Plaintiffs' claim also fails the second part of the Contracts Clause test – which provides that State law does not violate the Contracts Clause when it is "is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Sveen*, 138 S.Ct. at 1822, quoting *Energy Res. Grp.*, 459 U.S. at 411-12.  This is a "means-end" test.  *Id.*  Where contracts are "substantially impaired" by state action, the State "must have a significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem."[20] *Energy Res. Grp.*, 459 U.S. at 411–12.

MCOFU concedes that combatting the COVID-19 pandemic is a "significant and legitimate public purpose."  *See* Pl. Brief at p. 12, quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a

---

[19]      As explained just last month by a Superior Court judge in denying a motion for preliminary injunction brought by a different union, the State Police Association of Massachusetts, against EO 595, "if the Commonwealth is eventually found to have violated its bargaining obligations, discipline imposed under the policy [adopted pursuant to EO 595] can be rescinded and the employee can be made whole through an award of back pay, removal of discipline from a personnel file, and similar measures." Memorandum and Order on Motion for Preliminary Injunction, September 23, 2021, *State Police Ass'n of Mass. v. Commonwealth*, 2184-CV-02117; a copy of which is attached hereto as Exhibit B.

[20]      This inquiry amounts to rational basis review *even if the state is a party to the allegedly impaired contract* where, as here, there is no indication that the government is "acting like a private party who reneges to get out of a bad deal" instead of acting in the public interest.  *See Sullivan*, 959 F.3d at 65-66.  The "default" presumption under the Contracts Clause is that a law impairing existing contracts is "valid and done in the public interest."  *Sullivan*, 959 F.3d at 66; *see also*, *Baptiste*, 490 F. Supp. 3d at 385 (where Contracts Clause claim involves private contract, rational basis review applies).  "Less deference" applies only where the state is a party to the contract *and* there are indications that the government "has engaged in reneging" instead of acting for the public good.  *Sullivan*, 959 F.3d at 66.  "Reneging is, at its core, about impairments imposed to benefit the state financially, or as a matter of 'political expediency.'"  *Id.*  Here, it is obvious that EO 595's vaccination mandate is unrelated to any economic term of the CBA. It is decidedly not an example of a state just trying to "get out of a bad deal" or a matter of "political expediency."  Accordingly, the usual "rational basis" scrutiny embodied by the Contracts Clause's "means-end" test applies here, notwithstanding that the Commonwealth is a party to the CBA.

compelling interest . . . .").  As to the "means" part of the test, EO 595 easily qualifies as "appropriate" and "reasonable" not only as a matter of common sense but also for the numerous reasons explained in the Declaration of Lawrence Madoff, filed herewith and detailed in the Facts section, *supra*, at pp. 2-4.  The three COVID-19 vaccines readily available in Massachusetts have been proved both safe and effective and, collectively, have been administered to *billions* of people globally; COVID-19 has exacted a staggering toll on public health that includes more than 18,000 deaths and more than 780,000 infections in the Commonwealth alone; the immunity provided by vaccination is more reliable and superior to any so-called "natural" immunity obtained from infection; and vaccination not only serves the interests of those who are vaccinated but also protects the community at large – not only from spread of disease but from emergence of new and more dangerous variants of SARS-Co-V-2.

Finally, a "means-end" inquiry must encompass the circumstances in which the *specific* contract at issue operates.  Here, EO 595 meets an acute need in the specific context of the prison system, because congregate living settings are especially vulnerable to COVID-19 spread.  *See* Madoff Dec. at ¶ 24; *see also Foster v. Comm'r of Correction*, 484 Mass. 698, 703-04 (2020) ("infections among staff are of particular concern" in prison settings); *Comm. for Pub. Counsel Servs. v. Chief Justice*, 484 Mass. 431, 436 (2020), *aff'd as modified*, 484 Mass. 1029 (maintaining social distancing "may be nearly impossible in prisons and jails").  Accordingly, should any doubt linger as to whether the "means" of EO 595 is "reasonable" and "appropriate" in relation to its desired outcome, that doubt must quickly dissipate in view of the Commonwealth's goal of stopping the spread of COVID-19 in the state prison system.  Because any impairment to the CBA caused by EO 595 is not "substantial," and is, in any event, readily justified under the applicable test, Plaintiffs have shown no likelihood of success on Count I of the Complaint.

**B.      Plaintiffs Have No Likelihood of Success on Their Substantive Due Process Claims (Counts II and III).**

**1.      Plaintiffs' Due Process Claims Trigger Only Rational-Basis Review.**

"The Fourteenth Amendment protects against deprivation of life, liberty, or property without due process of law." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 8 (1st Cir. 2005). "The substantive component of this guarantee guards against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.*, quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986). In Counts II and III, Plaintiffs invoke substantive due process in an attempt to procure strict judicial scrutiny. For the following reasons, however, the Plaintiffs are entitled, at most, to rational basis review of EO 595, which the Executive Order easily satisfies.

**a.      Where the State Acts as Employer, No More Than a Rational Nexus Between the Job and the Deprivation of Rights is Required Under the Substantive Due Process Clause.**

Historically, the Supreme Court has found the distinction between the state's role in governing the citizenry at large and the government's role as employer to be "highly significant," and has applied what was essentially a rational basis test to certain types of claims brought by employees. *See Kelley v. Johnson*, 425 U.S. 238, 244, 248 (1976). "[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008), quoting *Cafeteria & Rest. Wkrs. v. McElroy*, 367 U.S. 886, 896 (1961). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Id.*, quoting *Waters v. Churchill*, 511 U.S. 661, 75 (1994) (plurality opinion). "Given the common-sense realization

17

that government offices could not function if every employment decision became a constitutional matter, constitutional review of government employment decisions must rest on different principles than review of . . . restraints imposed by the government as sovereign." *Id.* at 599 (citations omitted).  In other words, in many circumstances, the government *qua* employer is held to a standard no more stringent than rationality in regulating its workforce, even where precisely the same regulation might require a higher level of judicial scrutiny if applied generally to the population at large.[21]

As explained in *National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134 (2011), where the Supreme Court upheld a government employer's practice of seeking information about contract employees' history of drug use and treatment as part of a background investigation, judicial review of challenged government actions must "take into account the context in which they arise." *Id.* at 148-49, quoting *Cafeteria & Rest. Wrkrs.*, 367 U.S. at 896.  There Court applied a rational basis style of review, asking whether the background check questionnaire consisted of "reasonable, employment-related inquiries that further the Government's interests in managing its internal operations." *Id.* at 151, quoting *Engquist*, 553 U.S. at 600.  The Court found that the questionnaire was "reasonable" and fell "within the 'wide latitude' granted the

---

[21]    To be sure, in *Janus v. Am. Fed. of State, Cty., & Mun. Employees*, 138 S. Ct. 2448 (2018), the Supreme Court rejected rational basis review in a case involving compulsory agency fees for non-union members of public-sector bargaining units, even though the government was arguably acting in its capacity as employer.  *Id.* at 2465. But that case involved a claim of First Amendment, compelled speech, which is ordinarily subject to the strictest form of constitutional scrutiny, *see id.* at 2463-64, and the Court noted generally that rational basis review is "foreign to our free-speech jurisprudence."  *Id.* at 2465.  Even so, the Court applied a form of scrutiny akin to that typically applied to commercial speech regulations, in recognition that the government has greater latitude to regulate the speech of its employees than that of citizens generally.  *Id.* at 2477.  Here, of course, there is no compelled speech or other First Amendment claim.

Government in its dealings with employees."[22]  *Id.* at 154.  And the Court expressly rejected any notion that NASA had some burden to demonstrate that its prying questions were "necessary" or the "least restrictive means of furthering its interest."  *Id.* at 153.

Here, similarly, the Executive Order is tailored to the context of *employment* – and only to employment within one branch of state government.  It does not apply to all state employees (the judicial and legislative branches are not covered), let alone all Massachusetts residents eligible to receive a vaccine.[23]  Consistent with cases like *NASA* and *Engquist*, the level of scrutiny the Court should apply to EO 595 is rational basis review.[24]

---

[22]     In *NASA*, the Supreme Court noted that background checks of the type then at issue were used by "millions" of private employers, *id.* at 149, and stated that, "[l]ike any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will 'efficiently and effectively' discharge their duties."  *Id.* at 152; *see also id.* at 154 (the reasonableness of NASA's procedures was "illustrated by their pervasiveness in the public and private sectors").  The same point is applicable here. There is no obvious reason why a public employer should be any less able to implement a COVID-19 vaccination requirement than would be a private employer.

[23]     The United States Census reports that the estimated population of Massachusetts as of July 1, 2019 was 6,892,503.  *See* United States Census, "Quick Facts," https://www.census.gov/quickfacts/MA. The proportion of the population that was under age 18 as of that date was 19.6 percent.  *Id.*  Accordingly, 80.4 percent of the population was comprised of adults as of July 1, 2019, for a total of 5,789,703.  Thus, the proportion of people required to be vaccinated as a condition of their employment under EO 595 (approximately 44,000) as compared to the overall adult population of the Commonwealth is less than one percent.  Because EO 595 "does not require every adult member of the public to be vaccinated," the case presented here is easier than that presented in *Jacobson*, 197 U.S. 11.  *See Klaassen*, 7 F.4th at 593.

[24]     The Plaintiffs appear to seek some higher level of review when they repeatedly insist, without citation, that a government employer cannot condition employment on the relinquishment of certain liberty or privacy interests.  *See* Pl. Brief at pp. 2, 15, 18; *see also* Complaint at ¶¶ 41, 51.  This is incorrect, as illustrated by cases like *Engquist* and *NASA*.  Government employers may impact their employees' privacy and freedom in ways that the government acting more broadly likely could not.  *See Engquist*, 553 U.S. at 599 ("the Fourth Amendment does not require public employers to obtain warrants before conducting a search of an employer's office").  In *Engquist*, the Court summarized the cases by articulating two overarching principles:  "First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context.  Second, in striking the appropriate balance, we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer."  *Id.* at 600.

**b.      Plaintiffs Have Identified No "Fundamental Right."**

Ignoring the above-described distinction between a regulation that impacts government

employees and a regulation that impacts the citizenry more generally, Plaintiffs argue that

EO 595 deserves heightened scrutiny because MCOFU's members' "fundamental rights" are at

stake.  *See* Pl. Brief at pp. 14-15, 17; *see also Mulero-Carrillo v. Roman-Hernandez*, 790 F.3d

99, 107 (1st Cir. 2015) (where no "fundamental right" is affected, the test for substantive due

process is whether "the governmental infringement is not rationally related to a legitimate

government purpose.").[25]  They have, however, failed to identify any "fundamental" right that is

impacted by the Executive Order.[26]

**i.      The Executive Order Does Not Implicate Any
Fundamental Liberty Interest.**

First, Plaintiffs assert that EO 595 infringes on their "liberty interest" to decline unwanted

medical treatment under *Cruzan v. Dir., Missouri Department of Health*, 497 U.S. 261, 278

(1990).  This assertion is fatally flawed in two respects.  First, EO 595 simply does not impact

any right to decline medical treatment – or any other similar right to "bodily integrity" – because

it does not actually *require* any Massachusetts citizen to submit to vaccination.  The Executive

Order merely conditions employment on vaccination – it does not actually impose a legal

compulsion on any person to submit to vaccination.  Whether to comply with EO 595 is an

economic choice that every employee is free to make.  *See Bridges v. Houston Methodist Hosp.*,

---

[25]      Substantive due process analysis "must begin with a careful description of the asserted right."
*Reno v. Flores*, 507 U.S. 292, 302 (1993).

[26]      Consistent with the assumption adopted *arguendo* that EO 595 is "legislative" for purposes of the
Contracts Clause, *see* n.12, supra, Defendants again assume *arguendo* (without waiver to revisit the issue)
that EO 595 falls into the same category for purposes of substantive due process.  *See, e.g., DePoutot v.
Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005) (describing arguably more deferential standard of review for
state action that are characterized as "executive" in nature).

2021 WL 2399994, *2 (S.D. Tex. June 12, 2021) (employee not "coerced" by vaccination mandate where she "can freely choose to accept or refuse a COVID-19 vaccine; however, if she refuses, she will simply need to work somewhere else").  MCOFU's members obviously remain free to decline a COVID-19 vaccine and, thus, their reliance on *Cruzan* is misplaced.

Second, even if EO 595 were to affect general "liberty" interests[27] in some broader sense, the Plaintiffs' theory fails nonetheless because any interest MCOFU's members may have in declining a vaccine does not give rise to a fundamental right under *Jacobson*, *supra*.  *See Klaassen*, 7 F.4th at 593 ("*Jacobson*, which sustained a criminal conviction for refusing to be vaccinated, shows that plaintiffs lack [a fundamental] right" to decline vaccination); *Maniscalco v. New York City Dep't of Educ.*, 2021 WL 4344267, *3 (E.D.N.Y. Sept. 23, 2021) ("mandating a vaccine approved by the FDA does not" infringe on fundamental constitutional rights); *see also, Glucksberg*, 521 U.S. at 710, quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (the Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce

---

[27]     There is an important difference between a general "interest" and "fundamental interest" or a "fundamental right."  In *Cruzan*, the Court noted that a "constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions," including (but not limited to) *Jacobson* – which construed the vaccination mandate as requiring *some* justification sufficient to satisfy the constitution, albeit what now would be called only a "rational" one.  *See Cruzan*, 497 U.S. at 278-79; *Jacobson*, 197 U.S. at 366 (police power may not be exercised arbitrarily).  The *Cruzan* Court went on to explain, "[b]ut determining that a person has a 'liberty interest' under the Due Process clause does not end the inquiry; 'whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests.'"  *Id.* at 279, quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982).  To engage with this "balancing" task, the *Cruzan* Court went on to identify the "right" at issue – and defined it narrowly.  The Court "assume[d]" only that "the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition."  *Id.* at 279.  Thus, *Cruzan* did nothing whatsoever to wring from the "general liberty interest" associated with refusing unwanted medical treatment, *Cruzan* at 278, any "fundamental right" to refuse a vaccination.  *See Washington v. Glucksberg*, 521 U.S. 702, 722–23 (1997), quoting *Cruzan*, 497 U.S. at 279 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases.  For example, although *Cruzan* is often described as a "right to die" case . . . we were, in fact, more precise: We assumed that the Constitution granted competent persons a 'constitutionally protected right to refuse lifesaving hydration and nutrition.'").

21

and open-ended."). And, of course, *Jacobson* "essentially applied rational basis scrutiny" to a vaccination mandate. *See Roman Cath. Dioc.*, 141 S. Ct. at 70 (Gorsuch, J., concurring). This Court must do the same. *See Klaassen*, 7 F.4th at 593 (courts "must apply the law established by the Supreme Court").

ii.     **Plaintiffs Have No "Fundamental Right" in Continued Employment by the State.**

Plaintiffs also assert that they have a "property interest in continued employment" and suggest that this requires the Court to apply some heightened level of scrutiny to EO 595. *See* Complaint at ¶¶ 53, 57. Although Plaintiffs may have a constitutionally significant interest in continued employment, any such interest is not constitutionally *fundamental* for due process purposes.[28] "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2104) ("Fundamental rights are those rights created by the Constitution . . ."); *DeKalb Stone, Inc. v. Cty. of DeKalb*, 106 F.3d 956, 959 n.6 (11th Cir.1997) ("[P]roperty rights have been important common law rights throughout history and [. . .] they are protected in many situations by procedural due process. Nevertheless, common law rights are not equivalent to fundamental rights, which are created only by the Constitution itself."); *Maniscalco*, 2021 WL 4344267 at *3. Because Plaintiffs' alleged property rights are not "fundamental," rational basis review applies. *See Norris v. Stanley*, 2021 WL 3891615, *2 (W.D. Mich. Aug. 31, 2021).

---

[28]     Curiously, the Plaintiffs seem to acknowledge this in their brief when they define their property right as a right "not to have their employment security infringed on by arbitrary and capricious governmental action." Pl. Brief at 17.

### 2.     EO 595 Easily Survives Rational Basis Review.

Under rational basis review, "[a] law survives . . . so long as [it] is rationally related to a legitimate governmental interest." *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).  As such, a governmental defendant need only present "plausible reasons" supporting the challenged action, *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980), and show that the State action does not "rest[] on grounds wholly irrelevant to the achievement of the State's objectives."  *Heller v. Doe*, 509 U.S. 312, 324 (1993) (internal quotations omitted).  Here, the Court need look no further than *Jacobson* to assure itself that EO 595 readily survives rational basis scrutiny.  *See Klaassen*, 7 F.4th at 593 (under *Jacobson*, "there can't be a constitutional problem with vaccination against SARS-CoV-2"); *Dr. T. v. Scott*, 2021 WL 4476784, *2 (D.R.I. September 30, 2021) ("courts have held for over a century that mandatory vaccination laws are a valid exercise of a state's police powers, and such laws have withstood constitutional challenges"); *Harris v. Univ. of Mass.*, 2021 WL 3848012, *6 (D. Mass. Aug. 27, 2021), quoting *Zucht v. King*, 260 U.S. 174, 176 (1922) (Supreme Court has settled "that it is within the police power of a state to provide for compulsory vaccination"); *Valdez v. Grisham*, – F. Supp. 3d – , 2021 WL 4145746, *7 (D. N.M. Sept. 21, 2021) (same as *Harris*); *Doe v. Zucker*, 520 F. Supp. 3d 217, 252 (N.D.N.Y. 2021) ("It is well-settled that it is within a state's police power to establish regulations implementing mandatory vaccine laws and vest local officials with enforcement authority.").  The Executive Order is rationally related to the legitimate (and compelling) government interest in stemming the spread of COVD-19, *Roman Cath. Diocese*, 141 S. Ct. at 67, and the vaccines are a safe and effective way to prevent the spread of COVID-19, see pp. 2–4, *supra*.  Therefore, requiring vaccination for executive department employees is a rational way to slow the spread of COVID-19.  Because EO 595 easily survives rational basis review, the Plaintiffs have demonstrated no likelihood of success on the merits of Counts I & II.

### C.     Count IV Fails Because It Is Barred By the Eleventh Amendment.

Plaintiffs do not in any way rest their motion for preliminary injunction on the foundation

of Count IV – and for good reason.  That count alleges that EO 595 exceeds the Governor's

constitutional authority under the Massachusetts Declaration of Rights.  *See* Complaint at ¶¶ 59–

61.  But this is purely a question of state law, and is barred entirely barred by the Eleventh

Amendment.  *See O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998) ("It is not

the proper purview of a federal court to supervise state officials' compliance with state law.");

*see also Pennhurst*, 465 U.S. at 106; *Harris*, 2021 WL 3848012, at *7.  In short, Plaintiffs have

failed to make a strong showing that they are likely to succeed on any claim they assert.

## II.     The Plaintiffs Have Not Shown Irreparable Harm.

Moving on to the second prong of the preliminary injunction inquiry, Plaintiffs have

failed to identify any actual harm that is legally "irreparable."  The loss of a job is not the sort of

harm that may give rise to injunctive relief.  *See Micro Networks Corp. v. HIG Hightec, Inc.*, 188

F. Supp. 2d 18, 22 (D. Mass. 2002) (monetary injury "does not constitute irreparable harm"); *see*

*also E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th

Cir. 2005) ("A permanent loss of employment, standing alone, does not equate to irreparable

harm."); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)

(denying injunctive relief because "[t]he loss of a job is quintessentially reparable by money

damages").  In fact, several courts have considered whether irreparable harm exists in the

specific context of challenges to employment-related vaccination mandates, and all have found it

lacking.  *See Norris*, 2021 WL 3891615, **2-3; *Int'l Bhd. of Teamsters, Local 743 v. Central*

*States, Southeast & Sw. Areas Health & Welfare & Pension Funds*, 1:21-cv-03840, (N.D. Il.

Aug. 3, 2021) (ECF #21) at 2, a copy of which is attached hereto as Exhibit C (no irreparable

injury where "make-whole relief" was available if vaccination mandate violated labor law);

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Essentia Health*, 280 F. Supp. 3d 1161, 1165 (D. Minn. 2017); Mem. & Order in *State Police Ass'n*, Ex. B hereto, at pp. 6-7.

Finally, to the extent the Plaintiffs rely on a presumption of irreparable harm arising from their assertion of constitutional claims, their reliance is misplaced. *See Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (cases where irreparable harm is shown by alleging deprivation of a constitutional right are "almost entirely restricted to [those] involving alleged infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief"). And, any such presumption that might exist in the context of constitutional claims can only arise if a likelihood of success on those claims is shown.[29] *See Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020). Because the Plaintiffs demonstrate no cognizable form of irreparable harm, an injunction may not enter.

## III.    There is No "Fit" Between an Injunction and the Public Interest Here.

Finally, balancing the interests in this instance shows a scale that is steeply lopsided – in favor of upholding the vaccination mandate. *See Harris*, 2021 WL 3848012, at *8 (describing "strong public interest" in "preventing further spread of COVID-19 . . . a virus which has infected and taken the lives of thousands of Massachusetts residents"); *see also Valdez*, 2021 WL 4145746, at *13 (same); *United States v. Donziger*, 2020 WL 5152162, *2 (S.D.N.Y. Aug. 31, 2020) (no question that "limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies"); *Bimber's Delwood, Inc. v.*

---

[29]    Similarly, where, as here, "the movant fails to demonstrate a likelihood of success on the merits, the remaining elements [of the preliminary injunction inquiry] are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

*James*, 496 F. Supp. 3d 760, 789 (W.D.N.Y. 2020) ("Weakening the State's response to a public-health crisis by enjoining it from enforcing measures employed specifically to stop the spread of COVID-19 is not in the public interest."); Mem. & Order in *State Police Ass'n*, Ex. B hereto, at p. 8 ("the public interest is, unquestionably, best-served by stopping the spread of the virus, in order to protect people from becoming ill, ensure adequate supply of medical services, and curtail the emergence of new, deadlier variants of the virus").

Here, MCOFU's members (at least some of them) are "not asking to be allowed to make a self-contained choice to risk only their own health." *Klaassen v. Tr. of Ind. Univ.*, 2021 WL 3073926, *43 (N.D. Ind. 2021), quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). Instead, their preference to decline a COVID-19 vaccine "necessarily bears on the health of other[s]." *Id.* Notwithstanding the uncomfortable truth that those who voluntarily decline to be vaccinated necessarily put others at risk (unless they isolate from society entirely), executive department employees remain free to so choose. And when one measures the potential economic harm to individuals arising from that choice against the public health catastrophe that COVID-19 has been and continues to be, there is simply no comparison. Here, the vast public benefit of increased vaccination far outweighs the private preferences of those who could be vaccinated but refuse it. This Court simply should not, based purely on the preferences of a relative few, restrain a public health initiative highly likely to materially reduce the rate of transmission of a deadly infection that has already taken far too many lives.

## <u>CONCLUSION</u>

For all of the reasons asserted herein, Plaintiffs' motion must be denied.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Jennifer E. Greaney*
Jennifer E. Greaney (BBO No. 643337)
*Assistant Attorney General*
Christine Fimognari (BBO No. 703410)
*Special Assistant Attorney General*
Grace Gohlke (BBO No. 704218)
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2981/2206/2527
DATED: October 13, 2021                Jennifer.Greaney@mass.gov
Christine.Fimognari@mass.gov
Grace.Gohlke@mass.gov


## CERTIFICATE OF SERVICE

I hereby certify that the above document, filed electronically through the Court's electronic case filing system on October 13, 2021, will be sent electronically to counsel for all parties registered on the Court's electronic filing system, and paper copies of the document will be sent by first class mail, postage pre-paid, to non-registered parties.

*/s/ Jennifer E. Greaney*
Jennifer E. Greaney
Assistant Attorney General