UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS CORRECTION OFFICERS FEDERATED UNION, MICHAEL MOSHER, ZAC GUSTAFSON, DENINA DUNN AND ANGELA PUCCI, Plaintiffs, <br><br> v. <br><br> CHARLES D. BAKER, In his Official Capacity as Governor of the Commonwealth of Massachusetts, and CAROL A. MICI, in her Individual Capacity as Commissioner of the Massachusetts Department of Correction, Defendant. | Civil Action NO. 21-11599-TSH |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**
October 15, 2021

**HILLMAN, D.J.**

**Introduction**

The Massachusetts Correction Officers Federated Union ("MCOFU") and four individual members of the MCOFU, Michael Mosher, Zac Gustafson, Denina Dunn and Angela Pucci (collectively, "Plaintiffs") have filed this lawsuit against Governor Charles D. Baker and Massachusetts Department of Correction Commissioner Carol A. Mici alleging violations of the Contracts Clause of the United States Constitution (Count I), violations of their Fourteenth Amendment rights in connection with the Commonwealth requiring that employees be fully

vaccinated to continue employment (Counts II and III) and that the vaccine requirement is an ultra vires act under the Massachusetts Declaration of Rights (Count IV).[1] Plaintiffs have moved for a preliminary injunction to prevent Defendants from enforcing COVID-19 vaccine requirements, for which the deadline to comply is October 17, 2021. Defendants oppose the motion. The matter was heard on October 14, 2021. For the reasons discussed herein, Plaintiffs'' motion for a preliminary injunction is denied.

## Factual Background

### COVID-19 and the COVID-19 Vaccine

COVID-19 is an infectious disease caused by the SARS-Co-V-2 virus.  *See* Madoff Declaration (Docket No. 19) at ¶ 8.  It "is infectious, contagious, and can cause serious disease, hospitalization, and death." *Id.*  "The long-term negative consequences of COVID-19 infection, even for those who were vaccinated before infection or have only mild symptoms, are not yet fully understood." *Id.* at ¶¶ 8.  *Id.*

Currently, however, COVID-19 is a "vaccine preventable disease."  Madoff Decl. at ¶10. The U.S. Food and Drug Administration ("FDA") has approved three COVID-19 vaccines for use:  Pfizer BioNTech ("Pfizer"), Moderna, and Johnson & Johnson's Janssen ("J&J").  *Id.*  "The FDA reviewed extensive safety data on each of the vaccines prior to authorizing its use and deemed them safe." *Id.* at ¶16. The Pfizer COVID-19 vaccine has received FDA approval for people aged 18 and over, and has been authorized by the FDA for people aged 12 to 17. *Id.* at ¶13. The Moderna and J&J COVID-19 vaccines have been authorized by the FDA for people aged 18 and over.  *Id.*  Doses of these vaccines have been administered to billions of people

---

[1] The Court acknowledges Dr. Yonatan Grad, Dr. Monik Jiménez, Dr. Amir M. Mohareb and Prisoners' Legal Services for their amici curiae brief. *See* Docket No. 26.

globally and "extensive systems are in place to monitor their safety on an ongoing basis." *Id.* All three vaccines are widely available in the Commonwealth. *Id.* at ¶ 14.

COVID-19 continues to spread, primarily in unvaccinated populations. Madoff Decl. at ¶ 17. While no vaccine is 100% effective, "[u]nvaccinated individuals are at much higher risk of infection, and therefore at much higher risk of transmitting COVID-19 to their contacts both in their homes and communities and in the occupational setting. In a recent CDC report, unvaccinated people were 11 times more likely to die of COVID-19 and 10 times more likely to be hospitalized, than those who were fully vaccinated.[2] Vaccination benefits not only the person receiving the vaccine, but also others in that person's community, because a high population level vaccination rate reduces the likelihood of community spread of the virus, including breakthrough" infections. *Id.* at ¶ 20. Additionally, an increased vaccination rate in the overall population reduces the opportunity for new variants of SARS CoV-2 to emerge. *Id.* at ¶ 21. The importance of limiting opportunities for new variants to develop and thrive is illustrated by the Delta variant, which is far more infectious than the original strain of SARS-CoV-2 and has now become the dominant strain of the virus in Massachusetts and nationally. *Id.*

Although people who have been infected with SARS Co-V-2 may have some protective immunity to reinfection, the level of that protection is highly variable from person-to-person, while "the level of immunity derived from vaccination against COVID-19 is reliably high and well validated in numerous studies." Madoff Decl. at ¶ 22. Vaccinated people are less likely to be reinfected with the virus. *Id.* at ¶23.

---

[2] *See* https://www.cdc.gov/mmwr/volumes/70/wr/mm7037e1.htm?s_cid=mm7037e1_w, Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17, 2021, September 17, 2021.

*Executive Order No. 595 – the Vaccine Mandate*

The Executive Order ("EO 595"), issued by Governor Baker on August 19, 2021, states:

Section 1: It is the policy of the Commonwealth that all executive department employees shall be required to demonstrate that they have received COVID-19 vaccination and maintain full COVID-19 vaccination as a condition of continuing employment.

The Order further requires that:

Section 2: The Human Resources Division ("HRD") shall within 60 days of this order establish and issue a written policy for all executive department employees to require proof of COVID-19 vaccination, and the heads of all executive department agencies, bureaus, departments, offices, and divisions shall then implement the terms of the HRD policy. The HRD policy shall include the elements listed below:

1. a requirement that all executive department employees demonstrate no later than October 17, 2021 to their employing agency, bureau, department, office, or division that they have received COVID-19 vaccination and, going forward, that they demonstrate they are maintaining full COVID-19 vaccination;

2. a procedure to allow limited exemptions from the vaccination requirement where a reasonable accommodation can be reached for any employee who is unable to receive COVID-19 vaccination due to medical disability or who is unwilling to receive COVID-19 vaccination due to a sincerely held religious belief;

3. a method for documenting and verifying vaccination status among executive department employees that ensures all information will be maintained confidentially and separately from any employee's personnel files;

4. appropriate allowance of Commonwealth-provided sick leave or other time off for employees in order to obtain COVID-19 vaccination; and

5. appropriate enforcement measures to ensure compliance, which shall include progressive discipline up to and including termination for non-compliance and termination for any misrepresentation by an employee regarding vaccination status.

*See* Ex. 2 to Complaint (Docket No. 1) at p.2-3.

MCOFU and Individual Plaintiffs

The MCOFU is a party to a collective bargaining agreement with the Commonwealth. *See* Complaint (Docket No. 1) at ¶ 9. The individually named Plaintiffs have worked for varying lengths of time for the Massachusetts Department of Correction ("DOC") as Correction

Officers, responsible for the care, custody and control of the Commonwealth's inmate population. The positions in which Plaintiffs are employed are within statewide Bargaining Unit 4 ("Unit 4"), for which the Plaintiff MCOFU is the duly-designated collective bargaining representative. Pursuant to Mass. Gen. L. c. 150E, § 6, MCOFU and the Commonwealth have negotiated and entered into a series of collective bargaining agreements which establish the terms and conditions of employment of Unit 4 members. The CBA expired by its own terms on June 30, 2021. *See* Complaint at ¶ 9, Ex. 1, p. 81, Art. 34. Pursuant to an evergreen or continuation clause, however, the CBA's terms have remained in effect since that date. *See id.*, p. 81, Art. 34.

The CBA contains numerous provisions regarding MCOFU members' health and fitness to serve as Correction Officers ("COs"), including references to the possibility of infectious diseases entering DOC facilities and various terms that may impact privacy concerns of COs. For example, the CBA requires MCOFU members "to be subject to an immediate drug test if probable cause of drug use exists as determined by his/her Superintendent or management designee." CBA, p. 76, Art. 29. The CBA provides for "Physical Fitness Standards" for COs to be developed by the Human Resources Division ("HRD") of the Commonwealth's Executive Office of Administration & Finance, including standards of fitness for initial hiring as a CO. *Id.*, pp. 76-78, Art. 30, & Memorandum of Understanding ("MOU"), pp. 89-90. Additionally, an MOU attached to the CBA includes requirements for COs' personal appearance and grooming. *Id.*, p. 101.

Article 32 of the CBA, entitled "Contagious Disease," requires testing for contagious diseases under specified circumstances, including testing for tuberculosis. *See* Complaint, Ex. 1, p. 79. If there is an outbreak of a contagious disease and a MCOFU member is found to have tested positive for the contagion and needing medication they "shall have such medication

5

provided by the Department [of Correction]." *Id*., p. 80, ¶ 6. Any employee who tests positive for tuberculosis must have a follow-up chest X-Ray. Id. at ¶ 7. Additionally, "[a]ny employee who tests positive for any communicable disease is expected to and must follow all recommended health procedures, i.e., the taking of medication, proper testing, etc., which are provided by the [DOC] and DPH." *Id*. at ¶ 9. Finally, the CBA states: "Where credible evidence exists (as determined by the appropriate state Agency or Department) of a communicable disease (e.g., Tuberculosis[i]s, Hepatitis B, etc.), the Employer shall forthwith make every reasonable effort to provide all employees coming into contact with the afflicted person(s) and/or environment, with appropriate training and advice." *Id*., p. 61, Art. 20, §1.C.

Since the onset of the pandemic, the DOC has taken a variety of mitigation measures to reduce the introduction, exposure, and transmission of COVID-19 at its facilities. They include regular testing of staff and inmates; mandatory quarantining of all those testing positive; offering vaccines; requiring that staff wear face masks at all times; ensuring that social distancing is practiced; and regular deep cleaning of surfaces. *See* O'Connor Affidavit (Docket No. 2, Ex. 1), ¶ 9.  EO 595, the specific terms of which are set forth above, requires as a condition of continued employment that all employees within the state Executive Department, including Plaintiffs and all those in positions within Bargaining Unit 4, demonstrate, by October 17, 2021, that they have received the full COVID-19 vaccination. It affords a limited exemption for those either unable to receive the vaccination due to medical disability or unwilling to receive the vaccine due to sincerely held religious beliefs.

On August 23, 2021, the Director of HRD's Office of Employee Relations, John Langan, sent an e-mail attaching a draft Vaccine Verification Policy to MCOFU's counsel with a request that MCOFU's representatives "[p]lease let [him] know a good time for us to meet." *See* Langan Declaration ("Langan Decl."), (Docket No. 22) at ¶ 5. On August 24, 2021, MCOFU's attorneys

6

requested that the Commonwealth "bargain in good faith . . . over the decision to require vaccinations. . . ." Complaint at ¶ 25; Ex. 3. On August 25, 2021, Langan requested a meeting "as soon as possible" and proposed to "immediately begin good faith negotiations over [its] impact." Complaint at Ex. 3; Langan Decl. at ¶7, Ex. B. On September 8, 2021, Langan again asked for a meeting with MCOFU's representatives. *See* Langan Decl. at ¶ 8, Ex. C. On September 11, 2021, MCOFU's lawyer wrote to Langan that MCOFU was willing to meet for negotiations "over the decision to impose the vaccination mandate and its impacts on the bargaining unit[,]" but "we do not believe that good faith bargaining can occur until, if and when, the Governor rescinds his order." *Id*. at ¶ 9, Ex. D. Langan responded on September 13, 2021, with a proposal for a meeting on September 15, 2021. *Id*. at ¶ 10 & Ex D. On September 14, 2021, MCOFU filed a prohibited practices charge with the Commonwealth's Department of Labor Relations ("DLR"), claiming that the Commonwealth is obligated to bargain over both the decision to implement a vaccination mandate and the mandate's impacts on MCOFU's members. *Id*. at ¶ 12, Ex. E.

## Standard of Review

*Injunctive Relief*

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012). To obtain such relief, the Court must consider: (1) the movant's likelihood of success on the merits on his/her claims; (2) the likelihood of the movant suffering irreparable harm in the absence of the injunctive relief sought; (3) the balance of hardships between the parties; and (4) whether granting the injunction is in the public interest. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). Likelihood of success on the merits is the "main bearing wall of this framework." *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation

7

marks omitted) (*quoting Ross-Simons of Warwick, Inc*. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Global Mkts., Inc*., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal citation and quotation marks omitted). Plaintiffs "bear [ ] the burden of establishing that these four factors weigh in [their] favor." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## Discussion

### Preliminary Injunction Factors

Likelihood of Success on the Merits

The most important element in the preliminary injunction analysis is whether the movant has demonstrated a likelihood of success on the merits — an element that the First Circuit has described as the "sine qua non" of the preliminary injunction inquiry. *Ryan v. ICE*, 974 F.3d 9, 18–19 (1st Cir. 2020), (*quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc*., 287 F.3d 1, 9 (1st Cir. 2002)).

*Article I, §10 of the United States Constitution - Contracts Clause*

In Count I, Plaintiffs allege that EO 595 violates the Contracts Clause because it substantially impairs rights contained in the collective bargaining agreement between the Plaintiff MCOFU and the Commonwealth without any constitutionally significant offsetting public benefit.[3] Defendants argues that because MCOFU is currently pursing similar claims at the DLR, and

---

[3] Defendants assume arguendo at this stage that EO 595 is "legislative" for Contracts Clause purposes, and do so without waiver of their right to revisit the issue. Plaintiffs did not state otherwise at oral argument.

therefore its remedy under the CBA and state law remains intact, it cannot proceed with those same claims in this forum. The Court agrees with the Commonwealth.

Under the Contract Clause of the United States Constitution, "No state shall ... pass any ... Law impairing the Obligation of Contracts ...." U.S. Const. art. I., § 10, cl. 1. *See Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 n.3 (1st Cir. 2011). The clause does not bar a state from merely breaching a contract, which is the prerogative of any private party, subject to liability for the breach. *Id*. at 48. To establish a Contracts Clause claim, Plaintiffs must show more than a breach of the CBA; it must show that the Commonwealth has somehow impaired its ability to obtain a remedy for a demonstrated breach. *See Id*. at 48, citing *Crosby v. City of Gastonia,* 635 F.3d 634, 640 (4th Cir.2011) (explaining that the Contracts Clause "provides no basis to complain of an alleged impairment in the first instance," but supports a claim "where a state ... has foreclosed the imposition of an adequate remedy for an established impairment").

Here, the MCOFU has brought before the DLR its claim that the Commonwealth has an obligation to bargain with it over the decision to implement EO 595, whether the vaccine mandate was unlawfully added to the CBA as a condition of employment, and whether decisional bargaining was required before the vaccine mandate could be implemented. Because the MCOFU is pursuing a mechanism to defend its EO 595 claims pursuant to the CBA with the DLR, that precludes Plaintiffs from seeking to vindicate those same rights in this Court. Accordingly, Plaintiffs cannot show a likelihood of success on the merits of Count I.

Even if the Court determined that Plaintiffs' claim was subject to the Contract Clause, it could not establish a likelihood of success under the standard set forth in *Sveen v. Melin*. 138 S.Ct. 1815 (2018). "Although the language of the Contract[s] Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400,

410, 103 S.Ct. 697, 704 (1983), *quoting Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 239 (1934). Plaintiffs must show that the vaccine mandate "operate[s] as a substantial impairment of a contractual relationship," and is not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,' " *Sveen*, 138 S.Ct. at 1821-1822.

The alleged impairment asserted by the Plaintiffs are not substantial within the meaning of the test. Whether a state law "substantially impairs" a contract is answered by reference to three factors, whether the regulation "undermines the contractual bargain," whether it "interferes with a party's reasonable expectations," and whether it "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Applying these factors, EO 595 operates as a condition of employment and not a core provision of the CBA, which does not undermine the bargaining agreement and can be seen as a reasonable and foreseeable mechanism to maintain a safe work environment. Further, EO 595 does not appear to prevent Plaintiffs from safeguarding their rights, as the MCOFU is currently pursuing those claims at the DLR. Finally, even if Plaintiffs could show a substantial impairment of a contractual relationship, their claim under the Contracts Clause would not succeed because EO 595 is a reasonable and appropriate way to advance the significant goal of stopping the spread of COVID-19 in the state prison system.

<u>Substantive Due Process Claims</u>

The Fourteenth Amendment protects a person's substantive rights in life, liberty, and property without due process of law. U.S. Const. amend. XIV §. That prohibition applies fully to a state's political subdivisions, including municipalities and municipal agencies. *Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278, 286–87, 33 S.Ct. 312 (1913). The touchstone of this due process guarantee is the "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963 (1974). Substantive due

process provides "heightened protection against government interference" with "those fundamental rights which are deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S.Ct. 2258 (1997).

The criteria for identifying whether government action offends the guarantee of substantive due process hinge on the nature of the challenged government action. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S.Ct. 1708 (1998); *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir.2005). When challenging executive action under a substantive due process analysis, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. This holding reflects a realization that challenges to executive action must be viewed through the prism of "a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law." *Id*.

The Supreme Court has rejected the idea of a fundamental right to refuse vaccination. In *Jacobson v. Massachusetts*, 197 U.S. 11, 26–27, 25 S.Ct. 358, 361 (1905), the Supreme Court upheld a state law allowing cities and towns to implement vaccine mandates to contain smallpox outbreaks. The *Jacobson* Court emphasized that the "liberty secured by the Constitution ... does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id*. at 26. The Court recognized that states have the authority to enact quarantine and health laws, *id*. at 25, and that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. The Court explained that it was not the judiciary's role to determine the most effective method to protect the public against disease. *Id*. at 30. Instead, "[t]hat was for the legislative department to determine in the light of all the information it had or could obtain." *Id*.. The Court concluded the Massachusetts

statute was constitutional because it had a real and substantial relation "to the protection of the public health and the public safety" amid the smallpox epidemic. *Id*. at 30–32. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 70 (2020) (Gorsuch, J., concurring) (explaining that because the right to refuse vaccination is not a fundamental right, Jacobson is "essentially ... rational basis review").

Since *Jacobson*, courts have rejected the idea of a fundamental right to refuse vaccination. *See, e.g., Klaassen v. Trustees of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (rejecting a substantive due process challenge to a public university's vaccine mandate); *Maniscalco v. New York City Dep't of Educ.*, 2021 WL 4344267, *3 (E.D.N.Y. Sept. 23, 2021) ("mandating a vaccine approved by the FDA does not" infringe on fundamental constitutional rights); *Harris v. Univ. of Mass.*, 2021 WL 3848012, *6 (D.Mass. Aug. 27, 2021) (holding that no fundamental right exists where university's vaccine policy is rationally related to legitimate interests).

Plaintiffs argue that EO 595 deserves heightened scrutiny because MCOFU's members' fundamental rights are at stake, specifically a liberty interest to decline medical treatment and a property interest in continued employment.[4] The Commonwealth maintains instead that when the state acts as an employer, "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the

---

[4] At oral argument, Plaintiffs relied heavily on a recent Sixth Circuit case to support its contention that strict scrutiny should be applied here. *See Dahl v. Board of Trustees of Western Michigan University et al*, --- F.4th ---- 2021 WL 4618519 (6th Cir. October 7, 2021). In *Dahl*, several student athletes filed suit against Western Michigan University, arguing that the university violated their First Amendment right to free exercise of religion by denying them religious exemptions to the school's vaccine mandate for athletes. The Court, reviewing the vaccine policy through the lens of strict scrutiny, upheld the lower court's injunction allowing the student athletes to compete pending their ongoing lawsuit, noting that although it was a "close call," Defendants likely violated Plaintiffs' First Amendment rights. *Id*. at *1. This case, and others cited by the Plaintiffs where First Amendment free exercise is at issue, can be easily distinguished from the present case and the policy at issue, EO 595, which allows for an accommodation for a sincerely held religious belief. *See also, A. v. Hochul*, --- F.Supp.3d ----2021 WL 4734404 (NDNY October 12, 2021) (upholding injunction against vaccine mandate where religious exemption not provided)

government acting 'as proprietor, to manage [its] internal operation.'" *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598, 128 S.Ct. 2146, 2151 (2008), *quoting Cafeteria & Rest. Wkrs. v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749 (1961). Further, the Commonwealth points out that in *Kelley v. Johnson*, the Supreme Court distinguished between the state's role in governing the citizenry at large and the government's role as employer to be "highly significant," and has applied what was essentially a rational basis test to certain types of claims brought by employees. 425 U.S. 238, 244-248, 96 S.Ct. 1440, 1444 (1976). This argument is further supported "[g]iven the common-sense realization that government offices could not function if every employment decision became a constitutional matter, constitutional review of government employment decisions must rest on different principles than review of . . . restraints imposed by the government as sovereign." *Engquist*, 553 U.S. at 599. *See also National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 151-154 (2011) (upholding government employer seeking employees' history of drug use and treatment as reasonably connected to its interests). Consistent with this line of cases, where the vaccine requirement has a significant nexus to the employment of the Plaintiffs, a rational basis review will apply to EO 595.

To satisfy the rational basis test, "[a] law survives . . . so long as [it] is rationally related to a legitimate governmental interest." *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008). EO 595 meets the rational basis test. "Vaccination requirements, like other public-health measures, have been common in this nation." *Klaassen*, 7 F.4th at 593. Further, with its decision in *Jacobson*, the Supreme Court "settled that it is within the police power of a state to provide for compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176, 43 S.Ct. 24 (1922).

Plaintiffs maintain that EO595 impairs their fundamental liberty interest in declining medical treatment and right to bodily integrity.[5] While the Commonwealth contends that Plaintiffs are not being forced to submit to the vaccine mandate, but are free to decline the condition of employment, such a finding is not necessary under *Jacobson*. Jacobson and recent cases show that declining a vaccine does not give rise to a fundamental right and rational basis scrutiny will apply. *See Jacobson*; *Klaassen*; *Harris*; *Maniscalco*.

The same can be said for Plaintiffs' assertion that they have a fundamental right to their continued employment by the DOC. While Plaintiffs may "have a right to engage in their chosen professions," governmental infringement on this right will be "presumed to be valid" so long as it is "rationally related to a legitimate state interest." *Klaassen* I, —— F. Supp. 3d at ——, 2021 WL 3073926, at *17 (*quoting City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)); *Maniscalco*, 2021 WL 4344267 at *3.

EO 595 is rationally related to the legitimate government interest in stemming the spread of COVD-19, *Roman Cath. Diocese*, 141 S. Ct. at 67, and the vaccines are a safe and effective way to prevent the spread of COVID-19. It is also, "unquestionably a compelling interest." *Id*. Requiring vaccination for executive department employees is a rational way attain this. For these reasons, the Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits.

---

[5] Plaintiffs assert that EO 595 infringes on their liberty interest to decline unwanted medical treatment under *Cruzan v. Dir., Missouri Department of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841 (1990) but that reliance is misplaced. *Cruzan* held that a competent individual had a constitutional right to refuse unwanted lifesaving hydration and nutrition. *See Cruzan*, 497 U.S. at 279. Cruzan's holding, however, was limited to an individual's choice related to the refusal of lifesaving medical care and nutrition, with no impact on the health of others or the public.

***Irreparable Harm, Balance of the Harms and Public Interest***

Because the Court finds that the Plaintiffs have failed to demonstrate a likelihood of success on the merits, "the remaining merits are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). Therefore, the final three factors in the analysis for a preliminary injunction need only be addressed briefly. None of the factors, irreparable harm, balancing of the harms or the public interest favorably impact the Plaintiffs' requested injunction. While Plaintiffs' members may suffer the harm of losing employment, it is well settled that the loss of employment is not considered irreparable for the purposes of an injunction. *See Micro Networks Corp. v. HIG Hightec, Inc.*, 188 F. Supp. 2d 18, 22 (D.Mass. 2002) (monetary injury "does not constitute irreparable harm")

Plaintiffs also assert that their position is bolstered by the fact that inmates in the state prison system are not required to be vaccinated and the same alternative protocols, such as mask wearing, testing and social distancing should also remain in for the COs. This attempt fails to logically support that the argument — bolstered by the well-known and well-documented medical and scientific information regarding COVID-19 and its transmission — actually disfavors their position. Congregate facilities like prisons are particularly high-risk environments for COVID-19, see *Commonwealth v. Nash*, 486 Mass. 394, 406 (2020), and by Plaintiffs' own contention, COs have the potential to spread COVID-19 into their own communities, as they "spend the vast majority of their work days in the presence of inmates … and also have families and participate in activities outside of their work that bring them into contact with" the public. *See* Complaint at ¶27. As did the Massachusetts State Troopers in a similar case addressed in Massachusetts state court, Plaintiffs "frame the public interest too narrowly, by focusing on its members to the exclusion of everyone else." *State Police Association of Massachusetts v.*

*Commonwealth*, 2184-cv-02117, Order Denying Mtn. for Prelim. Injunc., Slip Op. 8 (Mass. Sup. Ct., Sept. 23, 2021)

Even considering the economic impact on the Plaintiffs if they choose not to be vaccinated, when balancing that harm against the legitimate and critical public interest in preventing the spread of COVID-19 by increasing the vaccination rate, particularly in congregate facilities, the Court finds the balance weighs in favor of the broader public interests.

## Conclusion

Plaintiffs' Motion for Preliminary Injunction (Docket No. 2) is hereby ***denied***. [6]

.

                         /s/ Timothy S. Hillman
                         **TIMOTHY S. HILLMAN**
                         **UNITED STATES DISTRICT JUDGE**

---

[6] Count IV of Plaintiffs complaint alleges that EO 595 exceeds the Governor's constitutional authority under the Massachusetts Declaration of Rights, i.e. an ultra vires act. Plaintiffs failed to address this claim in either its oral argument or in its brief. Because the Commonwealth addressed the issue in its opposition, for the reasons stated in the Commonwealth's brief, Plaintiffs failed to show a likelihood of success on Count IV.